## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

Case No.        -Civ-
Judge
Magistrate Judge

| | |
|---|---|
| DEREK J. BRUCE, DERIVATIVELY AND ON BEHALF OF JIANGBO PHARMACEUTICALS, INC., <br><br>            Plaintiff, <br>    v. <br><br> CAO WUBO, FENG XIAOWEI, HUANG LEI, GE JIAN, GEORGE (GUOQING) ZHOU, JIN LINXIAN, ELSA SUNG, ZILING SUN, MICHAEL MARKS, AND JOHN (YANG) WANG, <br><br>          Defendants, <br><br>    - and - <br><br> JIANGBO PHARMACEUTICALS, INC., | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR: <br><br> (1) BREACH OF FIDUCIARY DUTY <br> (2) CORPORATE WASTE <br> (3) GROSS MISMANAGEMENT <br><br> <u>JURY TRIAL DEMANDED</u> |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff respectfully submits this Verified Shareholder Derivative Complaint against the defendants named herein based upon personal knowledge as to himself and his own actions, and as to all other matters, upon information and belief based upon the investigation of counsel.

## <u>INTRODUCTION</u>

1.      This is a shareholder derivative action on behalf of Nominal Defendant, Jiangbo Pharmaceuticals, Inc. ("Jiangbo" or "the Company") against Defendants Cao

Wubo, Feng Xiaowei, Huang Lei, Ge Jian, George (Guoqing) Zhou, Jin Linxian, Elsa Sung, Ziling Sun, Michael Marks, and John (Yang) Wang, for violations of fiduciary duties owed by them to Jiangbo.  These violations, in turn, have substantially injured the Company.

2.      As detailed herein, During the Relevant Time Period (defined herein), the Individual Defendants in breach of their fiduciary duties to the Company approved, acquiesced, and/or turned a blind eye to an undisclosed related party transaction between an entity majority owned by defendant Cao Wubo, Shandong Hilead Biotechnology Co., Ltd. ("Hilead") on one hand, and the Company on the other hand (the Hilead Transfer").

3.      The Individual Defendants caused Jiangbo to transfer RMB 200 million (or approximately $31 million (US) using current exchange rates) to Hilead, and attempted through their action and/or inaction to conceal the true nature of this transfer.

4.      There is no legitimate business reason for the undisclosed transfer of nearly $31 million dollars to Hilead, other than to wrongfully enrich defendant Cao Wubo. (The "Improper Transfer"). When regulators learned of the Hilead Transfer, they initiated proceedings against the Company, and the Company initiated an internal investigation.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2).  Plaintiff and Defendants are citizens of difference states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

## THE PARTIES

**Plaintiff**

7.     Plaintiff Derek J. Bruce is a shareholder of Jiangbo and was at relevant times a shareholder of the Company.  Plaintiff brings this action derivatively in the right of and for the benefit of the Company.  Plaintiff will fairly and adequately represent the interests of the Company and its shareholders in enforcing the rights of the Company. Plaintiff is a citizen of Bermuda.

**Nominal Defendant**

8.     Nominal Defendant Jiangbo is a Florida corporation with its principal executive offices located in Laiyang City, Yantai, Shandong Province, People's Republic of China ("PRC").   According to the Company's Form 10-K filed with the U.S. Securities and Exchange Commission ("SEC") on September 28, 2010, Jiangbo is a holding company that operates, controls, and beneficially owns through contractual arrangements Laiyang Jiangbo Pharmaceuticals Co. Ltd. ("Laiyang Jiangbo").  "Liayang Jiangbo researches, develops, manufactures, markets and sells pharmaceutical products and health supplements in the PRC."  Jiangbo's common shares commenced trading on May 12, 2009, on the OTCBB under the ticker symbol "JGBO."  On June 8, 2010, Jiangbo's shares were listed on the Nasdaq Global Market.  Trading of Jiangbo's shares was suspended by the Nasdaq on August 4, 2011, and its shares were delisted on October 17, 2011.

**Individual Defendants – Current Directors**

9.     Defendant Cao Wubo ("Cao") has served as the Company's Chairman of the Board since October 2007.  From October 2007 to June 2010, Cao also served as its

Chief Executive Officer ("CEO"). He has served as the chairman and general manager of Laiyang Jiangbo since 2003.  He is the founder of Laiyang Jiangbo.  According to the Company's Schedule 14A filed with the SEC on May 31, 2011, Cao owns approximately 35.8% of Jiangbo's outstanding shares. Cao is also the Chairman, CEO, and majority owner of Hilead.  Upon information and belief, Cao is a citizen of the PRC.

10.     Defendant Feng Xiaowei ("Feng") has been a Jiangbo director since October 2007.  Feng serves on the Company's Audit Committee, and is Chairperson of the Compensation Committee and the Nominating and Corporate Governance Committee.  Upon information and belief, Feng is a citizen of the PRC.

11.     Defendant Huang Lei ("Huang") has been a Jiangbo director since October 2007.  Huang serves on the Company's Nominating and Corporate Governance Committee.  Upon information and belief, Huang is a citizen of the PRC.

12.     Defendant Ge Jian ("Ge") has been a Jiangbo director since October 2007. Ge serves on the Company's Compensation Committee and Nominating and Corporate Governance Committee.  Upon information and belief, GE is a citizen of the PRC.

13.     Defendant George (Guoqing) Zhou ("Zhou") has been a Jiangbo director since May 27, 2011.  Zhou is a member of the Company's Audit Committee.  Upon information and belief, Zhou is a citizen of the PRC.

**Individual Defendants – Current and Former Officers**

14.     Defendant Jin Linxian ("Jin") has been Jiangbo's CEO since July 2010. Before that, Jin was Deputy General Manager of Production Technology at Laiyang Jiangbo.  Upon information and belief, Jin is a citizen of the PRC.

15.     Defendant Elsa Sung ("Sung") was Jiangbo's Chief Financial Officer

("CFO") from 2007 until her resignation effective March 31, 2011.  Sung is a licensed CPA in the State of Georgia and a member of the American Institute of Certified Public Accountants.  Upon information and belief, Sung is a citizen of Florida.

16.    Defendant Ziling Sun ("Sun") has been the Company's Interim CFO since May 12, 2011.  Sun worked at Laiyang Jiangbo prior to being appointed Jiangbo's Interim CFO.  Upon information and belief, Sun is a citizen of Massachusetts.

17.    The defendants described in ¶¶ 9-13 above shall be referred to henceforth as the "Director Defendants."   The defendants described in ¶¶ 9-16 above shall be referred to henceforth as the "Individual Defendants."

**Individual Defendants** - **Former Directors**

18.    Michael Marks ("Marks") was a Jiangbo director from July 18, 2008, until June 6, 2011.  Marks was the Chairperson of the Company's Audit Committee.  Upon information and belief, Marks is a citizen of the PRC.

19.    John (Yang) Wang ("Wang") was a Jiangbo director from September 8, 2008, until June 6, 2011.  Wang was a member of the Company's Audit Committee and Compensation Committee.  Upon information and belief, Wang is a citizen of the PRC.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

20.     The Individual Defendants, because of their positions of control and authority as directors or officers of the Company, were able to and did, directly and indirectly, control or fail to control the wrongful acts complained of herein.  Because of their directorial and executive positions with the Company, each of the Individual Defendants had access to adverse non-public information about the financial condition and operations of the Company, including, without limitation, the misconduct of the other

Individual Defendants.

21.     At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of said agency.

22.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial, business, and corporate affairs of the Company. By virtue of such duties, the officers and directors of the Company were required, among other things, to:

    a.    Manage, conduct, supervise and direct the business affairs of the Company in accordance with the laws of the United States, the states and countries in which it conducted business, and the Company's charter and bylaws;

    b.    Implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors, and employees of the Company from violating or acting in contravention to applicable federal and state laws, rules and regulations, and those of the countries in which it conducts business; and

    c.    Refrain from using their status as directors or officers to the detriment of the Company and its shareholders.

23.     Each of the Individual Defendants further owed to Jiangbo the duty of loyalty requiring that each favor Jiangbo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage, which requires, *inter alia*, scrutiny of interested party transactions and rejection of such transactions which are unfair to the Company or evince corporate waste. The duty of loyalty further requires a duty of candor requiring full and candid disclosure of all facts

relevant to any potential conflict of interest and said interested party transactions.

24.     The Board has an Audit Committee.  According to the Company's May 31, 2011, Schedule 14A, "The purpose of the Audit Committee is to assist the Board in fulfilling its responsibilities to oversee the Company's financial and accounting operations.  The Audit Committee reviews and is responsible for, among other things, the Company's system of internal controls, its financial reporting process, the audit process, and the Company's processes for monitoring compliance with laws and regulations. Specific responsibilities of our Audit Committee include, among other things:

- Review and approve all transactions with affiliates, related parties, directors and executive officers.

- Appoint, compensate, retain and oversee the work of any independent auditor engaged for the purpose of conducting the annual audit of the Company's books and records, preparing or issuing an audit report or performing other audit review or attest services for the Company.

- Review the independent auditors' performance.

- Discuss with the independent auditor and management the independent auditor's judgment about the quality, not just the acceptability, of the Company's accounting principles.

- Following an audit, review significant difficulties encountered during the audit.

- Review significant disagreements among management and the independent auditors in the preparation of the Company's financial statements.

- Review and approve of all transactions with affiliates, related parties, directors and executive officers."

## SUBSTANTIVE ALLEGATIONS

25.     On March 30, 2011, Jiangbo engaged Bernstein & Pinchuk LLP ("B&P") as its principal accountant to replace Frazer Frost, LLP ("FF"), which advised the

Company that it did not intend to stand for re-appointment as its principal accountant for its next fiscal year.  The change in accountants was approved by the Audit Committee and the full Board.  According to a Form 8-K filed with the SEC on April 4, 2011, the change "did not result from any dissatisfaction with the quality of professional services rendered by FF."  Additionally, "[i]n connection with the audit of the Company's financial statements for the fiscal years ended June 30, 2010 and 2009 and the subsequent interim period, (i) there were no disagreements with FF on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedures, which disagreements, if not resolved to FF's satisfaction, would have caused FF to make reference in connection with its opinion to the subject matter of the disagreement, and (ii) there were no "reportable events," as that term is described in Item 304(a)(1)(v) of Regulation S-K."

26.    In a Form 8-K filed with the SEC on April 20, 2011, the Company stated it was notified that, effective April 14, 2011, B&P had entered into a joint venture agreement with Marcum LLP and formed Marcum Bernstein & Pinchuk LLP ("Marcum BP") "in a transaction pursuant to which B&P merged its China operations into Marcum BP and certain of the professional staff of B&P joined Marcum BP as employees of Marcum BP."  As a result, on April 14, B&P resigned as Jiangbo's independent accounting firm and was replaced, with the approval of the Audit Committee, by Marcum BP.

27.    In a Form 10-Q/A filed with the SEC on May 27, 2011, Jiangbo disclosed for the first time that it had:

> received a letter of informal investigation dated December 22, 2010 from the . . . SEC . . . requesting the Company to provide certain documents.

The letter indicated that the Company should not construe the investigation as an indication by the SEC or its staff that any violation of law has occurred or any adverse reflection on any person, entity or security.

In February 2011, the Company, through its Audit Committee, commenced an internal investigation into certain transactions. ***On March 26, 2011, the staff of the SEC having been informed by the Company of its internal investigation, notified the Company that it had begun a non-public formal investigation and requested certain information and materials relating to certain aspects of the Company's public disclosures and operations.*** The SEC has advised the Company that its investigation is not intended to suggest that the SEC believes at this time that the Company has done anything wrong and is in fact a fact finding investigation. ***The Company is committed to cooperating with the SEC Investigation and has responded to the SEC's request for materials and information. In light of the SEC's investigation, the Company, through its Audit Committee, decided that the investigation should be conducted as an independent investigation and that the scope of the independent investigation should cover all issues raised by the SEC Investigation.*** To that end the Audit Committee retained an international, U.S.-based law firm and an international professional accounting firm to conduct a comprehensive review of the issues raised by the SEC Investigation. The SEC Investigation and the Independent Investigation are still in their early stages, and the Company cannot predict the duration or outcome of the investigations, or the impact, if any, those investigations may have on the Company's financial condition or results of operations.

(emphasis added).

28.  The Audit Committee retained the law firm of Cadwalader, Wickersham & Taft LLP ("Cadwalader") to conduct the independent investigation at the direction of the Committee. The Committee also retained Ernst & Young (China) Advisory Ltd. ("E&Y") to provide forensic accounting services at Cadwalader's direction.

29.  Trading in the Company's shares was halted by the Nasdaq on May 31, 2010 and never resumed.

30.  On June 7, 2011, the Company filed a Form 8-K with the SEC (the "June 7 8-K"). It said that:

On May 23, 2011, the Board of Directors of the Company received a letter from its independent director, Mr. Michael Marks, dated May 23, 2011 ("Mr. Marks' First Letter"), in which Mr. Marks informed the Company that he did not wish to stand for re-election to the board at the Company's 2011 annual meeting of stockholders which is scheduled to be held on June 28, 2011 at 9:00 a.m. Beijing Standard Time, which is equivalent to June 27, 2011 at 9:00 p.m. U.S. Eastern Standard Time (the "Annual Meeting"). As a result, Mr. Marks would also cease to be a member of the Company's Audit Committee from the date of the Annual Meeting. Mr. Marks informed the Company that his decision not to stand for re-election at the Annual Meeting was due to increased professional commitments as a result of which he will be unable to commit the appropriate time to the Company's affairs.

31.     The Marks' First Letter specifically stated:

With respect to the nomination by the members of Nominating and Corporate Governance Committee for my reelection as independent director at the company's forthcoming AGM, I would like to inform that committee, and the entire Board of Directors of Jiangbo, that I will not be standing for reelection as independent director at the forthcoming AGM when my current term expires. I have increasing professional commitments and will be unable to commit the appropriate time to Jiangbo in the future. Furthermore, I believe that as part of good corporate governance, the company should change its independent directors every few years and I am coming up the end of three years of service.

Provided the company continues to fulfill its obligations as a U.S. public company, I am willing to serve until the end of my current term and continue to assist the company with its endeavors in respect of the capital markets and the regulators in the U.S. until the AGM.

32.     The June 7 8-K stated the Board had received a similar letter from Wang.

It stated:

In addition, on May 23, 2011, the Board of the Company received a letter from its independent director, Mr. John Wang, dated May 23, 2011 ("Mr. Wang's First Letter"), in which Mr. Wang informed the Company that he did not wish to stand for re-election to the board at the Company's Annual Meeting. As a result, Mr. Wang would also cease to be a member of the Company's Audit Committee and Compensation Committee from the date of the Annual Meeting.

33.     The Wang First Letter stated:  "As with Michael [Marks], I am also

coming on 3 years of service as an independent director. Therefore, I will also not stand for re-election at the upcoming AGM. Please make the appropriate plans with legal counsel to amend the proxy documents as appropriate."

34.     The June 7 8-K noted that on May 26, 2011, Wang informed the Board by letter ("Wang's Second Letter") that he had certain disagreements with the Company. Wang's Second letter stated:

> If the Company needs an enumeration of differences there are too many to list exhaustively. Suffice it to say, there are many areas where I have disagreement with the Company. Specifically, I believe the Company should comply with the requests by E&Y and [Cadwalader], including but not limited to the requests for Elsa [Sung]'s computer and a list of all the computers and emails used by employees for business purposes. Moreover, I believe (and the Audit Committee has asked for over a year now) the Company should implement standard 404 policies as suggested by KPMG. Furthermore, I believe (and we have also asked for over a year) the Chairman should delegate check approval control to the CFO or CEO. Finally, I also disagree with the common practice by the company (also related to control over check writing) of late payment of professional fees, expenses, even salaries and financial obligations to investors/debt holders. These practices are unprofessional and increases risk to the company, it's [sic] management and shareholders. Something as little as showing up for organized board calls and participating attentively is an important aspect of this professionalism.
>
> I hope the company can bring its business policies and procedures more in line with international best practices. It is my sincere belief that these improvements would greatly benefit the Company, it's [sic] shareholders and it's [sic] management.
>
> I hope that you can understand why I am not able to include that sentence in the 8K. If you think this email should be disclosed in the 8K then I will stand by that decision. I will leave that decision to the Company.

35.     The June 7 8-K stated the Board received a second letter from Marks dated June 6, 2011.  This letter said Marks was resigning immediately from the Board and the Audit Committee for the reasons stated in a separate letter to the Board also dated June 6, 2011.  The letters were included as exhibits to the June 7 8-K.

36.     The June 6 letter that Individual Defendant Marks wrote to the Board on behalf of the Audit Committee (the "Audit Committee Letter") contained shocking allegations about the Company's refusal to cooperate with the Committee's independent investigation.  It stated in part:

> the conduct and statements by the Company and those controlling and advising it have demonstrated a clear and continuing lack or cooperation over the past five weeks. Moreover. the manner and timing of the Company's payments to the Audit Committee's advisers (Cadwalader and E&Y) raise additional serious concerns regarding the veracity or correctness of banking information provided by the Company, and regarding the Company's ability and willingness to pay for necessary costs related to the internal investigation. As a result, the Audit Committee has determined that it can no longer effectively conduct an independent investigation as contemplated in the Audit Committee. The independent internal investigation has been halted. Cadwalader and E&Y have withdrawn from their respective engagements with the consent of the Audit Committee, and the independent members of the Audit Committee have determined to resign, effective today, as will be communicated in separate resignation letters to the Board of Directors.

37.     The Audit Committee letter went on to describe in detail the Audit Committee's repeated efforts to explain to Jiangbo's directors and management, in particular Individual Defendants Cao, the importance of the independent investigation vis-à-vis the SEC investigation; the need for the Committee's investigation to remain independent; the necessity for complete cooperation from the Company; the inability of Cadwalader and E&Y to share information about the investigation with the Company; the requirement that the Company pay Cadwalader and E&Y timely; the potential consequences to the Company if the SEC was not satisfied with the investigation; and other critical factors regarding the investigation.

38.     Despite this, the Audit Committee letter described numerous instances in which Individual Defendant Cao, and others such as Individual Defendants Jin and Sung

acting at his direction, refused to release information deemed critical by Cadwalader and

E&Y including bank statements, claimed he did not understand the purpose of the

investigation, requested sensitive information from Cadwalader and E&Y, refused to pay

professional fees in full, paid partial fees from a personal rather than a Company account,

and maintained the disclosure of certain information would violate Chinese law, among

other things.[1]

39.    Individual Defendant Marks summarized his reasons for resigning in the

Audit Committee letter as follows:

1.    *Lack of Cooperation.*  Over the past five weeks, the Company has
revealed an overall and continuing lack of cooperation, evidenced
most recently by the fact that the documents and information
received from the Company to date still remain deficient in
substantial respects. In light of this conduct, the Audit Committee,
Cadwalader and E&Y have been unable to conduct a thorough,
independent internal investigation. Despite numerous and lengthy
meetings, phone calls, emails, and memoranda in which expert
advisors explained the importance of the internal investigation and
the Company's cooperation with it, and despite the warnings of the
potential serious ramifications of the Company's lack of
cooperation, the situation has not improved in any material way.
We can conclude that the Company, and in particular Mr. Cao,
does not have the intention to cooperate with the internal
investigation.

2.    *Manner and Timing of Payments to the Audit Committee's
Advisors.*  Although the Company has made certain invoice
payments and retainer payments to Cadwalader and E&Y, the
manner and timing of those payments have raised serious concerns
regarding the Company's willingness and ability to pay for
necessary investigative costs, and concerns about the veracity of
banking information previously provided to Cadwalader and E&Y.
In particular, the Company has previously provided documents
indicating that it has a large cash balance at [redacted in original]
representing approximately [redacted in original]% of the
Company's cash balance as of December 31, 2010. Nevertheless,
the Company has not paid Cadwalader and E&Y from its accounts

---

[1] The entire letter is attached hereto and incorporated by reference herein as Exhibit A.

at [redacted in original]. Rather, the Company has paid the Audit Committee's advisers from either a much smaller Company account at [redacted in original] or, more troubling, from a personal bank account apparently belonging to an individual employee of Jiangbo. The Company also had previously indicated that the Company does not use and does not have access to Internet banking, but the Company transferred funds to the Audit Committee's advisers via Internet banking. Finally, although the Company pledged to timely pay an agreed-upon retainer to Cadwalader, the Company paid that retainer in piece meal and only days after it had indicated it would be paid in full. The Company explained to Cadwalader that the delay and partial payments were due to limitations placed on the Company's transfer of funds by the Company's banks. This explanation for the timing and manner of payment is either a troubling indication that the Company does not have free access to its cash balances, or a misleading excuse meant to hide the fact that the Company is unwilling to timely and fully honor its obligations to the Audit Committee.

3.   *No Realistic Options for Corrective Action.*  The Audit Committee has carefully considered potential ways in which the Company might be able to remediate the current situation, but have concluded that any such steps would be ultimately insufficient to permit the internal investigation to continue. Because we believe the primary source of the lack of cooperation is the Chairman, we have considered asking Mr. Cao to step down during the pendency of the internal investigation. However, we are convinced such a measure would be futile. First, we cannot unilaterally remove the Chairman for the pendency of the investigation, and understand that the Board would not act to remove Mr. Cao. Second, it is unreasonable to believe that Mr. Cao would voluntarily step down as Chairman. Third, even if Mr. Cao were to relinquish the chairman's position during the pendency of the internal investigation, the Audit Committee would fully expect, based on our experience and knowledge of the Company, that Mr. Cao would continue to exercise *de facto* control ever the Company and the Board. The recent and consistent history of the Company's lack of cooperation with respect to the internal investigation is therefore more than likely to continue, and has made it impossible for Cadwalader and E&Y to continue the internal investigation in a credible and appropriate manner. Under such circumstances, the independent members of the Audit Committee can no longer serve the interests of shareholders by remaining on the Board.

40.   The Audit Committee letter was signed by Marks and Wang.

14

41.     Among the issues subject to the investigation were an RMB 200 million capital payment to Hilead, an entity for which Individual Defendant Cao serves as Chairman and CEO and is the majority stockholder, and whether the Company had misrepresented the amount of cash on hand, among other things, in its financial statements.

42.     Also included with the June 7 8-K were letters from Marks and Wang dated June 6, 2011, tendering their immediate resignations from the Board.  The Marks letter stated he was resigning because "for the reasons detailed in writing to you in a separate letter of today's date, I feel the Company has made it impossible for me to fulfill my duties and that I have no choice but to resign.  It is my sincere hope that the Company can quickly rectify the circumstances that have occasioned my resignation."  The Wang resignation letter contained substantially the same language.

43.     On August 1, 2011, the Company filed a Form 8-K with the SEC in which it stated it had received a letter from the Listing Qualifications Staff of the NASDAQ on July 26, 2011.  The letter said that Nasdaq staff "believes that the continued listing of the Company's securities on Nasdaq is no longer warranted and has determined to delist the Company for the following reasons:"

(1)     Public interest concerns under Nasdaq Listing Rule 5101 raised by the efforts of the Company and its Chairman to obstruct the independent internal investigation authorized by its Audit Committee, and the failure to allow the Audit Committee to fulfill its responsibilities and duties;

(2)     The Company's failures to comply with Listing Standard Rule 5605(c)(3) and IM-5605-5, which sets forth the responsibilities and authority of the Audit Committee, as well as the statutory responsibilities and authority of the Audit Committee set forth in Section 10A(m)(2) of the Securities Exchange Act of 1934; and

(3)      the failure by the Company to comply with the Audit Committee composition requirements of Listing Rule 5605(c)(2)(A).

The 8-K continued:

> Unless the Company requests an appeal of Nasdaq's determination to delist by August 2, 2011, trading of the Company's shares of common stock will be suspended at the opening of business on August 4, 2011, and a Form 25-NSE will be filed with the Securities and Exchange Commission, which will result in the Company's securities being removed from listing and registration on Nasdaq.

> The Company has decided to focus on addressing current issues facing the Company and its business and will not appeal Nasdaq's determination.

44.     On October 6, 2011, the Nasdaq filed a Form 25 with the SEC advising that Jiangbo's stock would be delisted on October 17, 2011, because "Nasdaq Staff determined that the Company no longer qualified for listing on the Exchange pursuant to Listing Rules 5101, 5605(c)(3), IM-5605, and 5605(c)(2)(A)."  Trading never resumed after the Company's stock was suspended on August 4.  Its stock is now nearly worthless, trading on the OTC Pink Sheets in very light volume for well under $0.25 per share.

45.     During the Relevant Time Period, defined as the period from May 17, 2010, to the present, the Individual Defendants in breach of their fiduciary duties to the Company approved, acquiesced, and/or recklessly ignored an undisclosed related party transaction between Hilead, which is majority owned by Individual Defendant Cao, and the Company on the other hand.

46.     The Individual Defendants caused Jiangbo to transfer RMB 200 million (or $31 million (US) using current exchange rates) to Hilead, and attempted through their action and/or inaction to conceal the true nature of this transfer (the "Hilead Transfer").

47.     According to the Company' Form 10-K filed with the SEC on September 29, 2010, and the Schedule 14A filed with the SEC on May 31, 2011, Jiangbo leases two

warehouses from Hilead at a cost of approximately $103,000.  There is no legitimate business reason for the undisclosed transfer of nearly $31 million dollars to Hilead, other than to wrongfully enrich Individual Defendant Cao.  When regulators learned of the Hilead Transfer, they initiated proceedings against the Company; and the Company initiated an internal investigation.

48.     Defendant Cao did not cooperate with the regulatory proceedings or the internal investigation. Rather he used his control over the Company and Board to obstruct and ultimately halt the internal investigation concerning the Hilead Transfer.

49.     The purpose of the Audit Committee's investigation was to prevent further harm to the Company through further regulatory actions and potential shareholder litigation.

50.     The Audit Committee latter stated that the "SEC had threatened additional action against the Company if Cadwalader and E&Y are not allowed to conduct a prompt and thorough investigation into the six areas the SEC had identified."

51.     Rather than cooperate, Individual Defendant Cao refused to produce responsive information to the Audit Committee and its advisors and used his position and control over the Board and the Company's executive officers and employees to hinder the Audit Committee's truth seeking process.

52.     Due to the Hilead Transaction, and Individual Defendant Cao's obstruction of the Audit Committee's investigation, the Company's common stock was halted from trading in August 2011, and ultimately delisted by the Nasdaq, causing severe harm to the Company's ability to take advantage of the capital markets to sustain and grow the Company's business.

53.     In the wake of these disclosures the value of the Company's stock has lost nearly all of its value.  On July 15, 2011, and August 2, 2011, respectively, two securities fraud class actions were filed by investors against the Company and certain of its officers and directors, seeking substantial damages from the Company and others.  *Lagace v. Jiangbo Pharm., Inc.*, Case. No. 11-cv-22556-MGC (S.D. Fla.); *Lewis v. Jiangbo Pharm., Inc.*, Case No. 11-cv-22788-MGC (S.D. Fla).  On August 31, 2011, the two cases were consolidated under the caption of the former.  *Lagace*, Case. No. 11-cv-22556-MGC, ECF No. 6.

54.     *Lagace* is a federal securities class action brought on behalf of a class consisting of all persons other than Defendants who purchased the securities of Jiangbo between May 17, 2010 and May 31, 2011.  It alleges Jiangbo issued materially false and misleading statements and omitted to state material facts that rendered their affirmative statements misleading as they related to the Company's operations, financial condition, and certain financial transactions.  Specifically, Jiangbo "has significantly less employees than it claims; that it has materially smaller cash reserves than reported on its balance sheet and/or significantly constrained access to its cash; and that there was an undisclosed 200 million RMB transaction with Hilead . . . of a related party nature."

55.     The *Lagace* complaint alleged violations of the Sections 10(b) and 20(a) of the Securities Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).  The complaint maintained that the Company's SEC filings from May 17, 2010 (covering the third quarter of fiscal year 2010), through May 23, 2011 (covering the third quarter of fiscal year 2011), and certain other statements, contained material misrepresentations in that they overstated the

Company's available cash reserves or access to cash; claimed Jiangbo had far more employees than it actually employed; failed to disclose the Hilead Transaction; and failed to disclose a material weakness in the Company's internal controls in that Individual Defendant Cao is the only officer or director of Jiangbo who has "unilateral check approval authority" and thus *de facto* control over the Company.

56.     As a result of the Individual Defendants' deliberate and/or reckless action and/or inaction permitting the Hilead Transaction, causing or permitting the material misrepresentations in the Company's SEC filings, and obstructing or facilitating Individual Defendant Cao's obstruction of the Audit Committee's Investigation, the Individual Defendants have breached their fiduciary duties owed to the Company.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

57.     Plaintiff brings this action derivatively on behalf of the Company to redress injuries suffered by the Company as a direct and proximate result of the Individual Defendants' conduct. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

58.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting the Company's rights.

59.     Jiangbo is incorporated in Florida.  Under Florida law, "[a] complaint in a proceeding brought in the right of a corporation must . . . allege with particularity the demand made to obtain action by the board of directors and that the demand was refused or ignored by the board of directors for a period of at least 90 days from the first demand unless, prior to the expiration of the 90 days, the person was notified in writing that the corporation rejected the demand."  Fla. Stat. § 607.07401(2).

60.     By letter dated August 1, 2011, served on Jiangbo's registered agent in Florida on August 2, 2011, counsel for Plaintiff demanded that "Jiangbo's Board of Directors "("Board") immediately commence litigation on behalf of the Company against Cao Wubo ("Cao"), Feng Xiaowei ("Feng"), Huang Lei ("Huang"), Ge Jian ("Ge"), Michael Marks ("Marks"), John Wang ("Wang"), Jin Linxian ("Jin"), Else Sung ("Sung"),  Ziling Sun ("Ziling"), and any other appropriate Jiangbo directors and officers for breaches of fiduciary duty, securities fraud, abuse of control, gross mismanagement, unjust enrichment, and waste of company assets, in connection with their activities as directors and officers of the Company."[2]

61.     The demand letter went on to state:

As described in the complaint in the matter styled *Lagace v. Jiangbo Pharmaceuticals, Inc., et al.*, C.A. No. 11-cv-22556-MGC (S.D. Fla.) (the "*Lagace* Complaint"), Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling, among others, engaged in conduct in violation of Section 10(b) of the Securities Exchange Act (the "Act"), 15 U.S.C. § 78j, Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Act, 15 U.S.C. § 78t.  Further wrongdoing is described in a letter dated June 6, 2011, addressed to the Board from former Director and Audit Committee Chairman Marks and former Director and Audit Committee member Wang, Ex. 99.4 to Form 8-K filed with the United States Securities and Exchange Commission ("SEC") on June 7, 2011 (the "AC Letter"), in which Messrs Marks and Wang announced their resignation from the Board.

The AC Letter asserted, among other things, that:

•       The Company's senior management stonewalled an investigation of financial irregularities by the Audit Committee commenced after the SEC served a subpoena on the Company in late March 2011, by refusing to produce documents and pay the AC Committee's outside legal counsel and forensic accountant;

•       Documents that were not produced as part of the AC Committee investigation went to the heart of the Company's financial

---

[2] The entire letter is attached hereto and incorporated by reference herein as Exhibit B.

statements, and involved matters such as the amount of Jiangbo's cash reserves; its failure to pay interest on its debentures timely; the existence and location of certain bank accounts and the veracity of its bank statements; the number of people employed by the Company; and details regarding its sales, purchases, production, warehouse processes, acquisition of land use rights, computer and IT information, systems, and vendors;

- The Company used secondary accounts and personal accounts to pay expenses;

- Company officials claimed Jiangbo did not use internet banking but wire transfer records showed otherwise;

- Records showed Company officials used personal email accounts to conduct official business;

- Bank records indicated Jiangbo transferred RMB 200 million to Shandong Hilead Biotechnology Co. ("Hilead"), a company founded, chaired, and majority-owned by Cao, even though the two firms had no formal relationship, for the purpose of infusing capital into Hilead; and Company records indicated that Hilead was in possession of six of Jiangbo's computers;

- Jiangbo would never cooperate with the AC because Cao, as Chairman of the Board, is "the primary source of the lack of cooperation," and asking him to step down would be "futile," "the Board would not act to remove Mr. Cao," and even if he was removed, he "would continue to exercise *de facto* control over the Company and the Board;

- Marks emailed the Board on May 27, 2011, that "I second John [Wang's] concerns about the lack of professionalism within the company over many years of delayed payments, lack of focus of senior management, [and] commitment of company resources to related parties;" the latter reference being to Jiangbo's relationship with Hilead.

The *Lagace* Complaint alleges "Jiangbo issued materially false and misleading statements and omitted to state material facts that rendered their affirmative statements misleading as they related to the Company's operations, financial condition, and certain financial transactions" beginning on May 17, 2010, when the Company filed its Form 10-Q for the quarterly period ended March 31, 2010 (fiscal third quarter). *Lagace* Complaint, ¶¶ 2, 34. The *Lagace* Complaint is based largely on the allegations in the AC Letter. In addition, the *Lagace* Complaint noted that

trading of Jiangbo's common shares was halted by the SEC on May 31, 2011, and has yet to resume. *Id.*, ¶¶ 3, 43.

The *Lagace* Complaint listed the following disclosures in the AC Letter as containing materially adverse information that was not provided to the Company's shareholders:

- The Company had misled investors about the number of individuals it employed. As indicated in the Company's SEC filings . . . Jiangbo had approximately 1,400 employees as of May 20, 2010, "including 82 administrative staff, 412 production crew, 440 full-time salespersons and 560 part-time salespersons." However, as disclosed by the [AC L]etter, the current employee list indicates that there are less than 500 individuals employed by the Company.

- The Company's unwillingness to release employee e-mail information, in addition to the fact that only a mere fourteen email addresses were released during the independent investigation, further suggests that the Company materially misrepresented the size of its workforce by nearly a factor of three-to-one.

- [The AC Letter] clearly shows that the Company failed to disclose a 200 million RMB transaction of a related party nature, and that there was an undisclosed "commitment of company resources to related parties."

- The 200 million RMB transaction referenced by the [AC] Letter was to the benefit of Hilead . . . a private company in the same city as Jiangbo's main operating subsidiary.

- Defendant [Cao] is Chairman of the Board of Directors of Hilead, and was undoubtedly aware of the transfer due to his position within the two companies [due to] the fact that he had sole control over check issuance at Jiangbo.

- As a result, Jiangbo's transfer of 200 million RMB to Hilead is of an apparent related party nature. Moreover, the existence of the transfer, as well as its apparent related party nature went completely undisclosed by the Company.

- [B]oth the [AC] Letter and the Company's repeated failure to timely pay the interest and/or principle on the Debentures suggests that the Company either has drastically less cash than reported . . . or that it does not have access to said cash.

- [I]t is a significant and indisputable red flag that a Company with purported cash reserves of more than $100 million would continue to fail in its obligations with respect to the Debentures and thereby incur significant penalties at the expense of its shareholders.

- It is also a red flag that a Company with such purported cash reserves would pay professional fees [to the AC Committee's advisors] from, in one reported instance, an employee's personal checking account, and in the other instance, from a non-primary bank account that has (or should have) significantly less cash than the Company's primary account.

- If the Company does indeed have the cash reserves that it claims, the only other possible inference is that Jiangbo . . . does not have access to the assets of its main operating subsidiary, Laiyang Jiangbo (which, as indicated in the Company's most recent 10-K, has signed an equity pledge with one of Jiangbo's wholly-owned subsidiaries, thereby entitling Jiangbo to 100% of Laying [sic] Jiangbo's assets). This was undisclosed . . . and makes the Company's representation that it operates, controls, and beneficially owns Laiyang Jiangbo materially misleading.

- Lastly, the Company has made material misstatements and omissions with respect to the quality of its internal controls. As indicated by the [AC] Letter, Defendant [Cao] is the only officer or director of Jiangbo that [sic] has "unilateral check approval authority." In effect, this means that Defendant [Cao] – who is not an officer of Jiangbo – has *de facto* dictatorial control over the Company as he is the only member of the [sic] management that [sic] can authorize payments to third parties. This is a significant and material undisclosed weakness in the Company's internal controls.

\*          \*          \*          \*

Jiangbo has already expended millions of dollars in connection with the AC investigation.   It will spend millions more defending the SEC investigation that prompted the AC investigation and the *Lagace* securities fraud action, as well as any other governmental or private investigations or litigation instituted against the Company.   It is inevitable that Jiangbo will be required to restate its financial reports for *at least* the period covered by the *Lagace* action, *i.e.*, May 17, 2010, through May 31, 2011, and probably for a much longer time.   The Company may be liable for hundreds of millions of dollars in damages if it loses or settles the *Lagace* action and any other litigation brought by governmental authorities or private persons or entities.   In addition, the Company faces the prospect of

permanent delisting by the NASDAQ.   Furthermore, the Company's reputation has been severely damaged. The Company has also wasted a substantial amount of money in compensation and benefits paid to Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling.   Its market capitalization has been severely diminished, and its ability to raise equity in the future has been all but destroyed.   All of this substantial damage stems proximately from Cao's, Feng's, Huang's, Ge's, Marks's, Wang's, Jin's, Sung's, and Ziling's (and those of others employed by the Company) breaches of fiduciary duty, securities fraud, abuse of control, gross mismanagement, unjust enrichment, and waste of company assets in connection with their activities as directors and officers of the Company, as well as from Frazer's professional negligence, malpractice, and potentially fraudulent activity.

By reason of their positions as directors and/or officers and fiduciaries of Jiangbo, and because of their ability to control the business and corporate affairs of Jiangbo, Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling owed Jiangbo and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Jiangbo in a fair, just, honest, and equitable manner.   Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling were and are required to act in furtherance of the best interests of Jiangbo and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to Jiangbo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling, because of their positions of control and authority as directors and/or officers of Jiangbo, were able to and did, directly and/or indirectly, consciously commit and/or exercise control over the wrongful acts complained of herein.   Because of their executive, managerial, and director positions with Jiangbo, each of them had knowledge of material non-public information regarding the Company.   Once the members of Jiangbo's Board were placed on notice of material information concerning the Company's affairs, they were required to make immediate public disclosure of that information.   Additionally, once the Board is put on notice of illegal conduct, the Board has a duty to act on that information.

For the reasons described above, Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling all breached their fiduciary duties, committed securities fraud, abused their control, engaged in gross mismanagement, were unjustly enriched, and wasted company assets in connection with their activities as directors and officers of the Company, all of which

caused substantial harm to the Company and its shareholders.

Consequently, on behalf of our client, Derek J. Bruce, we hereby demand pursuant to Fla. Stat. § 607.07401, that Jiangbo's Board of Directors immediately commence litigation on behalf of the Company against: (1) Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling and any other appropriate Jiangbo directors and officers for breaches of fiduciary duty, securities fraud, abuse of control, gross mismanagement, unjust enrichment, and waste of company assets, in connection with their activities as directors and officers of the Company . . . .

Please be advised that the failure to take all of the actions demanded will result in the institution of litigation on behalf of the Company in accordance with the laws of the State of Florida.

62.     On August 12, 2011, plaintiff's counsel received by fax a letter of the same date from the firm of Locke Lord Bissell & Liddell LLP.  The letter advised Plaintiff's counsel the firm "was recently retained by Jiangbo to, among other things, advise the company and its directors with respect to your letter dated August 1, 2011." Exhibit C.

63.     Plaintiff received no further communications from Jiangbo or its counsel.

64.     The 90 day period from the date of first demand has run, and Plaintiff's demand has been ignored by Jiangbo's Board.  As a result, demand is futile pursuant to Fla. Stat. § 607.07401(2).

## FIRST CAUSE OF ACTION
## <u>BREACH OF FIDUCIARY DUTY</u>
### (Against All Individual Defendants)

65.     Plaintiff incorporates by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

66.     The Individual Defendants all owed a fiduciary duty to Jiangbo and its stockholders, the duty to exercise loyalty, good faith, due care, candor, and diligence in the management and administration of the affairs of the Company, as well as in the

auditing and reporting of the Company, and owed the duty of full and candid disclosure of all material facts thereto.

67.     As fiduciaries, to discharge these duties, the Individual Defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Jiangbo.

68.     In performing the aforementioned services, the Individual Defendants all breached, and continue to breach, their fiduciary duties, causing damages to Jiangbo, by, *inter alia*, (i) agreeing to and participating with and/or aiding and abetting one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders and their family members; (ii) failing to discover and prevent Jiangbo's violations of law (iii) failing to properly implement, oversee and maintain appropriate and adequate internal controls, practices and procedures for Jiangbo; (iv) failing to ensure that Jiangbo operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information; (v) failing to ensure that Jiangbo not engage in any unsafe, unsound, or illegal business practices; (vi) causing Jiangbo to be sued for, and exposed to, liability for violations of the anti-fraud provisions of the federal securities laws and potential criminal liability, as previously described herein.

69.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company and was made without any reasonable efforts to ensure the Company's interests were protected.

70.     The Individual Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, Jiangbo to suffer substantial monetary damages as a result of the wrongdoing herein, as well as further and even greater damage in the future, including exposure to forfeitures, fines and penalties, damage to Jiangbo's reputation and good will, the resulting loss of business and business opportunities, increased costs of capital, and otherwise.

71.     Jiangbo has been directly and substantially injured by reason of the Individual Defendants intentional breach and/or reckless disregard of their fiduciary duties to the Company.

72.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**GROSS MISMANAGEMENT**
**(Against All Individual Defendants)**

73.     Plaintiff incorporates by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

74.     The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the Company's operations and business.

75.     The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of the Company in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of the Company's affairs and in the use and preservation of its assets.

76.     During the course of the discharge of their duties, the Individual

Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused the Company to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged the Company.

77.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duties, including the duty of loyalty, as alleged herein, Jiangbo has incurred, and will likely incur in the future, massive financial damages, as well damages to its reputation and goodwill.

78.     As a result of the misconduct and breaches of fiduciary duty alleged herein, each of the Individual Defendants is liable to the Company.

79.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

### THIRD CAUSE OF ACTION
### <u>CORPORATE WASTE</u>
### (Against All Individual Defendants)

80.     Plaintiff incorporates by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

81.     By failing to properly consider the interests of the Company and its shareholders, by failing to conduct proper supervision, and by transferring approximately $30 million in Company funds to an entity controlled by Cao for no apparent business, the Individuals Defendants have caused the Company to waste valuable corporate assets.

82.     As a result of the Individual Defendants' corporate waste, they are liable to the Company.

83.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION
## RESTITUTION/UNJUST ENRICHMENT
### (Against Individual Defendant Cao)

84.     Plaintiff incorporates by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

85.     Defendant Cao was unjustly enriched by his receipt and retention of benefits from the self-interested transactions and the proceeds he received therefrom, as alleged herein, and it would be unconscionable to allow him to retain the benefits thereof.

86.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION
## CONTRIBUTION AND INDEMNIFICATION
### (Against All Individual Defendants)

87.     Plaintiff incorporates by reference all paragraphs above as if set forth herein. Jiangbo is alleged to be liable to various persons, entities and/or classes by virtue of the same acts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to Jiangbo.

88.     In addition, the Individual Defendants' misconduct and wrongdoing, and the disclosures and events described herein, have had, and will continue to have, a series of deleterious effects on Jiangbo, including but not limited to: (i) Exposure to forfeitures, fines, and penalties; (ii) Loss of business opportunities; (iii) Damage to Jiangbo's reputation and good will; (iv) Loss of existing or renewal business; (v) Increased costs of capital; (vi) Loss of confidence of the investing public in the integrity and management of Jiangbo, thereby resulting in Jiangbo losing market value and increasing Jiangbo's cost of capital; and (vii) As a result of the Individual Defendants' misconduct, Jiangbo is now exposed to SEC scrutiny and inquiry, and to suit by investors for losses resulting from

their misconduct and fraudulent activities, thereby, at a minimum, causing the Company to incur unnecessary direct and indirect investigatory, litigation and administrative costs, and potentially resulting in awards, judgments or settlements against Jiangbo.

89.     By reason of the foregoing violations of law and other related misconduct described herein, Jiangbo's alleged liability arises, in whole or in part, from the intentional, knowing, reckless, disloyal and bad faith acts or omissions of the Individual Defendants as previously alleged herein.

90.     Jiangbo is therefore entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against Jiangbo by virtue of the Individual Defendants' misconduct and wrongdoing.

91.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.     Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' conscious and willful breaches of fiduciary duties and other wrongdoing;

B.     Directing Jiangbo to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein.

C.     Awarding to Jiangbo restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation

obtained by the Individual Defendants;

D.    Directing Individual Defendant Cao to disgorge to the Company all of the funds he has received from the Hilead Transaction.

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury for all causes and issues so triable.

Dated: November 9, 2011                    Respectfully submitted,

                                          **THE ROSEN LAW FIRM, P.A.**

                               By: _____
                                          Laurence M. Rosen
                                          Fla. Bar No. 0182877
                                          275 Madison Avenue, 34th Floor
                                          New York, NY  10016
                                          Tel.:  (212) 686-1060
                                          Fax:  (212) 202-3827

                                          *Attorneys for Plaintiff*

OF COUNSEL:

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Marc A. Rigrodsky
919 N. Market Street, Suite 980
Wilmington, DE  19801
Tel.:  (302) 295-5310
Fax:  (302) 654-7530

**LAW OFFICES OF BRUCE G. MURPHY**
Bruce G. Murphy
265 Llwyds Lane
Vero Beach, FL  32963
Tel.:  (772) 231-4202
Fax:  (772) 234-6608

## <u>VERIFICATION</u>

I, Derek J. Bruce, hereby declare, under penalty of perjury as follows:

I am the plaintiff in the above-captioned shareholder derivative action. I have read the foregoing shareholder derivative complaint (the "Complaint") and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.


DATED: November 8TH, 2011

DEREK J. BRUCE

# EXHIBIT A

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 8-K
**CURRENT REPORT**

Pursuant to Section 13 or 15(d) of the Securities Exchange Act 1934

Date of Report (date of earliest event reported): **May 23, 2011**
**JIANGBO PHARMACEUTICALS, INC.**
(Exact name of registrant as specified in charter)

**Florida**
(State or other jurisdiction of incorporation)

| | |
|---|---|
| **001-34763** | **65-1130026** |
| (Commission File Number) | (IRS Employer Identification No.) |

**25 Haihe Road, Laiyang Economic Development**

**Laiyang City, Yantai, Shandong Province, People's Republic of China 265200**

(Address of principal executive offices and zip code)

**(0086) 535-7282997**

(Registrant's telephone number including area code)

(Registrant's former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12(b) under the Exchange Act (17 CFR 240.14a-12(b))

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02 Results of Operations and Financial Condition.**

On May 24, 2011, Jiangbo Pharmaceuticals, Inc. (the "Company") issued a press release announcing the Company's operating results for the third quarter fiscal year 2011. The Company hosted a conference call on May 25, 2011 at 8:300am Eastern time to discuss its financial results for the third quarter fiscal year 2011 March 31, 2011 . A copy of the press release is attached hereto as Exhibit 99.1.

**Item 5.02        Departure of Directors or Certain Officers; Election of Directors; appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On May 23, 2011, the Board of Directors of the Company received a letter from its independent director, Mr. Michael Marks, dated May 23, 2011 ("Mr. Marks' First Letter"), in which Mr. Marks informed the Company that he did not wish to stand for re-election to the board at the Company's 2011 annual meeting of stockholders which is scheduled to be held on June 28, 2011 at 9:00 a.m. Beijing Standard Time, which is equivalent to June 27, 2011 at 9:00 p.m. U.S. Eastern Standard Time (the "Annual Meeting"). As a result, Mr. Marks would also cease to be a member of the Company's Audit Committee from the date of the Annual Meeting. Mr. Marks informed the Company that his decision not to stand for re-election at the Annual Meeting was due to increased professional commitments as a result of which he will be unable to commit the appropriate time to the Company's affairs. A copy of Mr. Marks's First Letter is attached as Exhibit 99.2 to this Current Report on Form 8-K.

Subsequently, on June 6, 2011, the Board of Directors (the "Board") of the Company received a letter from Mr. Marks ("Mr. Marks' Second Letter") informing the Board that effective immediately he is resigning as a member of the Board and the chairman of the Audit Committee due to reasons indicated in a separate letter addressed to the Board of the Company dated June 6, 2011 ("Audit Committee Letter"). A copy of Mr. Marks's Second Letter and the Audit Committee Letter are attached as Exhibit 99.3 and 99.4 to this Current Report on Form 8-K, respectively.

In addition, on May 23, 2011, the Board of the Company received a letter from its independent director, Mr. John Wang, dated May 23, 2011 ("Mr. Wang's First Letter"), in which Mr. Wang informed the Company that he did not wish to stand for re-election to the board at the Company's Annual Meeting. As a result, Mr. Wang would also cease to be a member of the Company's Audit Committee and Compensation Committee from the date of the Annual Meeting. A copy of Mr. Wang's First Letter is attached as Exhibit 99.5 to this Current Report on Form 8-K. In addition, on May 26, 2011, Mr. Wang informed the Board ("Mr. Wang's Second Letter") that he had certain disagreements with the Company. A copy of Mr. Wang's Second Letter is attached as Exhibit 99.6 to this Current Report on Form 8-K.

Subsequently, on June 6, 2011, the Board of the Company received a letter from Mr. Wang ("Mr. Wang's Third Letter") informing the Board that effective immediately he is resigning as a member of the Board and a member of the Audit Committee due to reasons indicated in the Audit Committee Letter. A copy of Mr. Wang's Third Letter is attached as Exhibit 99.7 to this Current Report on Form 8-K.

On May 27, 2011, the Board of the Company by unanimous written consent appointed Dr. George (Guoqing) Zhou to serve as an independent director of the Company.  The Board determined that Dr. Zhou was an "independent director" as that term is defined and determined in accordance with Rule 5605(a)(2) of the Marketplace Rules of The NASDAQ Stock Market, LLC and Section 10A(m)(3) of the Securities Exchange Act of 1934, as amended.  Further, the Board appointed Dr. Zhou to serve as a member of the Audit Committee of the Board of the Company.

Dr. George (Guoqing) Zhou has served as the chief executive officer and a member of the board of directors of Beijing Tengzhong Investment Ltd. ("Tengzhong"), and Sichuan Tengzhong Heavy Machinery Industrial Co., Ltd. since August 2009. He has also been an independent director of China Media Express (Nasdaq: CCME) since November 2009. Prior to Tengzhong, Dr. Zhou was the Chief Operation Officer of Benda Pharmaceutical (BPMA.OB) ("Benda") from September 2008 to May 2009 . Prior to Benda, from June 2007 to July 2008, Dr. Zhou was a Partner and Managing Director of Eos Funds, where he directed investments in Chinese companies which intended to list on U.S. and Canadian exchanges. Prior to that, from November 2003 to May 2006, Dr. Zhou served as Co-Founder, President & CEO, and member of the Board of Directors of Abepharma Ltd. and Red Mountain Pharmaceuticals (China) Ltd. Dr. Zhou was a post-doctoral fellow in molecular biology at the University of Victoria, Canada and received a Ph. D. in molecular biology from Umea University, Sweden in 1996. He received his Masters degree in Genetics at Southwest University, China in 1986. He received a Bachelor degree from Chongqing Normal University in Biology in 1983. He was an associate professor from August 1996 to 1998 at Chongqing University, China.

Dr. Zhou does not have any family relationships with any of the Company's directors or executive officers, or any person nominated or chosen by the Company to become a director or executive officer.

**Item 9.01**        **Financial Statements and Exhibits.**

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release Dated May 24, 2011. |
| 99.2 | Letter from Mr. Michael Marks to the Company's Board of Directors dated May 23, 2011. |
| 99.3 | Letter from Mr. Michael Marks to the Company's Board of Directors dated June 6, 2011. |
| 99.4 | Letter from the Audit Committee, dated June 6, 2011.* |
| 99.5 | Letter from Mr. John Wang to the Company's Board of Directors dated May 23, 2011. |
| 99.6 | Letter from Mr. John Wang to the Company's Board of Directors dated May 26, 2011. |
| 99.7 | Letter from Mr. John Wang to the Company's Board of Directors dated June 6, 2011. |

* Certain portions of this Exhibit have been omitted based upon a request for confidential treatment and the omitted portions will be separately filed with the Securities and Exchange Commission.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

JIANGBO PHARMACEUTICALS, INC.

By:     /s/ Jin Linxian

Name: Jin Linxian

Title: Chief Executive Officer

Dated: June 7, 2011

Exhibit 99.1

*For Immediate Release*

Contact:

| | |
|---|---|
| Jiangbo Pharmaceuticals, Inc. | CCG Investor Relations |
| Mr. Jin Linxian, CEO | Mr. Crocker Coulson, President |
| Phone: +86 (535) 728-2397 | Phone: (646) 213-1915 |
| E-mail:jinlinxian@jiangbo.com | E-mail: crocker.coulson@ccgir.com |
| http://www.jiangbopharma.com | http://www.ccgirasia.com |

## Jiangbo Pharmaceuticals Announces Third Quarter Fiscal Year 2011 Results

### — Conference call scheduled at 8:30 a.m. Eastern Time on Wednesday, May 25, 2011 —

**Laiyang, China, May 24, 2011** – Jiangbo Pharmaceuticals, Inc. (Nasdaq: JGBO) ("Jiangbo" or the "Company"), a pharmaceutical company with its principal operations in the People's Republic of China, today announced its third quarter fiscal year 2011 financial results for the three and nine month periods ended March 31, 2011.

**Third Quarter Fiscal Year 2011 Highlights**

- Revenue decreased 29.2% to $18.1 million from $25.6 million in the corresponding quarter ended March 31, 2010

- Gross profit declined 35.3% to $12.0 million from $18.6 million in the corresponding quarter ended March 31, 2010

- Operating income decreased 56.5% to $6.0 million from $13.7 million in the corresponding quarter ended March 31, 2010

- Net income was $5.1 million, or $0.38 per basic share, for the quarter ended March 31, 2011, compared to $15.2 million, or $1.33 per basic share, for the quarter ended March 31, 2010

- Excluding non-cash gains related to the change in fair value of derivative liabilities of $2.8 million, amortization of debt discount and debt issuance costs related to convertible debentures of $2.4 million, and unrealized loss on investments of $49,264, non-GAAP adjusted net income for diluted EPS was $0.8 million, or $0.05 per fully diluted share, for the three months ended March 31, 2011, compared to non-GAAP adjusted net loss for diluted EPS of $11.3 million, or a loss of $0.74 per fully diluted share, for the quarter ended March 31, 2010.

- On January 4, 2011, the Company's Hongrui factory was awarded with the Good Manufacturing Practices Certificate for Pharmaceutical Products ("GMP Certificate") by China's State Food and Drug Administration ("SFDA"). The GMP Certificate is valid until the end of 2015.

- The Company appointed Marcum Bernstein & Pinchuk LLP as its new independent registered public accountants, effective March 30, 2011, replacing Frazer Frost, LLP, to begin providing services for the quarter ended March 31, 2011.

"Our fiscal third quarter 2011 revenue declined 29.2% on difficult comparisons to the same period last year, which benefitted from the release of pent-up demand caused by six weeks of downtime in late 2009 to complete Good Manufacture Practices recertification procedures at our main facility," said Jiangbo's CEO, Mr. Linxian Jin. "While several of our top products continued to experience relatively weak sales during the quarter, we are actively evaluating strategic options to enhance the Company's growth rate and build shareholder value. This quarter we continued to generate robust cash flow from operations and ended the period with over $146 million in cash and cash equivalents, some of which we plan to deploy on strategic acquisitions, such as our previously announced planned purchase of Shandong Xinkangqi Medical Company, a regional wholesale drug distributor in Shandong Province," continued Mr.Jin.

**Third Quarter Fiscal Year 2011 Results**

Total revenue for the three months ended March 31, 2011 decreased 29.2% to $18.1 million from $25.6 million in the comparable quarter of 2010, primarily reflecting lower sales of Clarithromycin Sustained Release Tablets, Itopride Hydrochloride Granules, Radix Isatidis Dispersible Tablets, and Baobaole Chewable Tablets, partially offset by incremental sales of Felodipine Sustained Release Tablets, which were launched in September 2010, and higher sales of Ciproflocacin Hydrochloride Tablets. During the third quarter of fiscal year 2011, the Company resumed production at its Hongrui factory, resulting in modest revenue contribution from the sale of Laiyang Pear Cough Syrup and Cold and Cough Granules.

The Company's total revenue in the third quarter of the prior fiscal year benefitted from the release of pent-up demand upon resumption of production at the Company's main facility after a six week shutdown in the second quarter of fiscal year 2010 to complete the Good Manufacture Practice ("GMP") recertification procedure.

For the three months ended March 31, 2011, Clarithromycin Sustained Release Tablets, Itopride Hydrochloride Granules, Radix Isatidis Dispersible Tablets, and Baobaole Chewable Tablets, accounted for approximately 43.7%, 24.4%, 14.9%, and 13.9% of the Company's total revenue, respectively.

Gross profit in the third quarter of fiscal year 2011 was $12.0 million, a decrease of 35.3% from $18.6 million in the prior year's corresponding period. Gross margin decreased to 66.5% from 72.7% in the prior year quarter, primarily due to an increase in raw material prices, particularly related to the Company's Clarithromycin Sustained Release Tablets and Radix Isatidis Dispersible Tablets and also due to a greater portion of sales from products with lower profit margin in the Western Pharmaceutical Medicines product category.

Selling, general and administrative expenses totaled $5.8 million for the three months ended March 31, 2011, up 53.9% from $3.8 million in the three months ended March 31, 2010. Advertising, marketing and promotional expenses for the third quarter of fiscal 2011 decreased to $15,000 from $1.1 million in the year ago period, primarily because the Company eliminated advertising activities at the corporate level and implemented a strategy that significantly increased commission payout percentages to its sales representatives. Depreciation and amortization increased to $1.5 million from $492,000 in the three months ended March 31, 2010, mainly attributable to the amortization of land use rights for two parcels of land that were purchased in the prior fiscal year. Salaries, wages, commissions and related benefits increased 89.8% year-over-year to $3.7 million, primarily due to accrued compensation to directors and the Company's decision to increase sales commission payouts to its sales representatives.

Research and development expenses totaled $0.2 million for the three months ended March 31, 2011, compared with $1.1 million for the three months ended March 31, 2010. The significant year-over-year decrease in research and development expense reflects the expiration, in September 2010, of the Company's R&D cooperative agreement with Shandong University.

Income from operations during the third quarter of fiscal year 2011 was $6.0 million, a 56.5% decrease from $13.7 million during the three months ended March 31, 2010.

Other income was $0.6 million, primarily reflecting non-cash gains related to the change in fair value of derivative liabilities of $2.8 million, partially offset by interest expense of $2.5 million.

Net income for the three months ended March 31, 2011 was $5.1 million, compared to $15.2 million in the year ago quarter. Basic earnings per share were $0.38, compared with $1.33 per basic share in the year ago period. In the third quarter of fiscal 2011, the Company recorded diluted earnings per share of $0.22, compared to $0.02 in the same quarter last year.

Excluding non-cash gains related to the change in fair value of derivative liabilities of $2.8 million, amortization of debt discount and debt issuance costs related to convertible debentures of $2.4 million, and unrealized loss on investments of $49,264, non-GAAP adjusted net income for diluted EPS was $0.8 million, or $0.05 per fully diluted share, for the three months ended March 31, 2011, compared to non-GAAP adjusted net loss for diluted EPS of $11.3 million, or a loss of $0.74 per fully diluted share, for the quarter ended March 31, 2010.

(*) See the reconciliation table at the end of this press release for a reconciliation of net income and EPS to non-GAAP adjusted net income and EPS.

**Nine Months Fiscal Year 2011 Results**

Total revenue for the nine month period ended March 31, 2011, increased by 1.6% to $69.2 million, compared to $68.1 million for the nine month period ended March 31, 2010. Gross profit decreased 2.7% to $48.9 million for the nine month period ended March 31, 2011 as compared to $50.2 million for the nine month period ended March 31, 2010. Gross profit margin was 70.6% for the first nine months of fiscal year 2011, versus 73.7% for the corresponding prior year period. Operating income was $33.5 million, unchanged compared to operating income in the comparable period of last year. Net income during the nine months ended March 31, 2011, was $26.8 million, or $2.09 per basic share, compared to $22.7 million, or $2.07 per basic share, for the corresponding period in 2010. Diluted earnings per share were $1.76 per share, compared to $0.57 per diluted share in the year ago period. Excluding non-cash gains related to the change in fair value of derivative liabilities of $15.1 million, amortization of debt discount and debt issuance costs related to convertible debentures of $12.2 million, and unrealized loss on investments of $68,210, non-GAAP adjusted net income for diluted EPS was $11.7 million, or $0.77 per fully diluted share, for the nine months ended March 31, 2011, compared to non-GAAP adjusted net loss for diluted EPS of $4.9 million, or a loss of $0.32 per fully diluted share, for the nine months ended March 31, 2010.

**Financial Condition**

As of March 31, 2011, the Company had $146.9 million in cash and cash equivalents as compared to $108.6 million at the end of fiscal 2010. Working capital was $139.6 million as of March 31, 2011 as compared to $88.5 million at the end of fiscal 2010. Shareholder's equity totaled $184.7 million, as compared to $134.5 million at the end of fiscal 2010. The Company generated $36.0 million in cash flow from operating activities during the first nine months of fiscal 2011.

**Business Outlook and Guidance**

Several of the Company's major products, including Clarithromycin Sustained Release Tablets, Itopride Hydrochloride Granules and Baobaole Chewable Tablets, have entered into mature stages of their product lifecycles. Management expects future sales of Clarithromycin Sustained Release Tablets to remain relatively flat compared to current levels and future sales of Itopride Hydrochloride Granules and Baobaole Chewable Tablets to moderately decline compared to current levels. Management expects a continued increase in sales of Felodipine Sustained Release Tablets and incremental revenue from the re-launch of several traditional Chinese medicines at the Company's Hongrui facility. Given management's current business outlook, the Company reaffirms its guidance of revenue between $94 million and $96 million for fiscal year 2011.

**Subsequent Events**

In April 2011, the Company through Laiyang Jiangbo Pharmaceutical Co., Ltd., a limited liability company organized under the laws of PRC and controlled by the Company through contractual arrangements, entered into a letter of intent with Shandong Xinkangqi Medical Company ("Xinkangqi"), a regional wholesale drug distributor in Shandong Province, pursuant to which Laiyang Jiangbo plans to acquire 100% of the outstanding equity of Xinkangqi. The Company plans to hire Marcum Bernstein & Pinchuk LLP, its current independent registered public accountants, to conduct due diligence on Xinkangqi beginning in late May 2011.

**Risk Disclosure**

The Company became delinquent in the payment of principal on its November 2007 Debenture on March 1, 2011. To date, we have remained unable to make these payments. We were required to repay the then outstanding aggregate principal amount of the November 2007 Debentures, together with all accrued interest and penalties. To date, no formal event of default notice has been presented by the sole holder of the November 2007 Debentures and we are currently in discussions with the sole holder of the November 2007 Debenture to resolve the delinquent situation. However, the sole holder of the November 2007 Debentures may deliver an event of default notice to us at any time. In the event that an event of default notice is delivered to us, a cross-default will occur with respect to our May 2008 Notes and the majority holder of the May 2008 Notes will have the right to deliver an acceleration notice with respect to th May 2008 Notes. In such an event, we may be forced to seek protection under the United States Bankruptcy Code. In addition, on May 30, 2011, we will be required to repay the then outstanding aggregate principal amount of the May 2008 Notes, together with all accrued interest. There can be no assurance that we will be able to make the repayments on time. In the event that we are unable to repay the May 2008 Notes, when due, the majority holder of the May 2008 Notes may deliver an acceleration notice to the Company with respect to the May 2008 Notes. In the event that an acceleration notice is delivered to us, we may be forced to seek protection under the United States Bankruptcy Code.

**Conference Call**

Jiangbo Pharmaceuticals, Inc. management will host a conference call at 8:30 a.m. Eastern Time on Wednesday, May 25, 2011 to discuss financial results for the third quarter fiscal 2011 ended March 31, 2011.

To participate in the live conference call, please dial the following number five to ten minutes prior to the scheduled conference call time: (866) 395-5819. International callers should dial +1 (706) 643-6986. The Conference ID for this call is 65647292.

If you are unable to participate on the live call, a replay will be available for 14 days starting on Wednesday, May 25, 2011 at 11:30 a.m. Eastern Time. To access the replay, dial (800) 642-1687, international callers dial +1 (706) 645-9291. The Conference ID is 65647292.

**Use of Non-GAAP Adjusted Financial Information**

This press release includes certain financial information, non-GAAP adjusted net income and non-GAAP adjusted fully diluted earnings per share, which are not presented in accordance with GAAP. Non-GAAP adjusted net income was derived by taking net income and adjusting it with non-cash gains or losses related to the change in fair value from derivative liabilities and the amortization of debt discount and debt issuance costs related to convertible debentures. The Company's management believes that these non-GAAP adjusted measures provide investors with a better understanding of the Company's historical results from its core business operations. To supplement the Company's condensed consolidated financial statements presented on a non-GAAP adjusted basis, the Company has provided non-GAAP adjusted financial information, which is non-GAAP adjusted net income and non-GAAP adjusted earnings per share, excluding the impact of these items in this press release. The non-GAAP adjusted information is not meant to be considered in isolation or as a substitute for GAAP financials. The non-GAAP adjusted financial information provided by the Company may also differ from non-GAAP adjusted information provided by other companies. A table at the end of this press release provides a reconciliation of the non-GAAP adjusted financial information to the nearest GAAP measure.

**About Jiangbo Pharmaceuticals, Inc.**

Jiangbo Pharmaceuticals, Inc. is engaged in the research, development, production, marketing and sales of pharmaceutical products in China. The Company's operations are located in Eastern China in an Economic Development Zone in Laiyang City, Shandong Province. Jiangbo produces both western and Chinese herbal-based medical drugs in tablet, capsule, granule, syrup and electuary (sticky syrup) form. For additional information, please visit the Company's website (www.jiangbopharma.com).

**Safe Harbor Statement**

Certain statements in this press release that are not historical facts are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements are not guarantees of future performance and are subject to risks and uncertainties that could cause the Company's actual results and financial position to differ materially from those included within the forward-looking statements. Forward-looking statements involve risks and uncertainties, including those relating to the Company's ability to introduce, manufacture and distribute new drugs. Actual results may differ materially from predicted results, and reported results should not be considered as an indication of future performance. The potential risks and uncertainties include, among others, the Company's ability to obtain raw materials needed in manufacturing, the continuing employment of key employees, the failure risks inherent in testing any new drug, the possibility that regulatory approvals may be delayed or become unavailable, patent or licensing concerns that may include litigation, direct competition from other manufacturers and product obsolescence. More information about the potential factors that could affect the Company's business and financial results is included in the Company's filings, available via the United States Securities and Exchange Commission.

- Financial Statements Follow –

## JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS

| | | March 31, 2011 | | June 30, 2010 |
|---|---|---:|---|---:|
| | | (Unaudited) | | |
| **ASSETS** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash and cash equivalents | $ | 146,886,471 | $ | 108,616,735 |
| Restricted cash | | 10,383,600 | | 11,135,880 |
| Investments | | 46,094 | | 168,858 |
| Accounts receivable, net of allowance for doubtful accounts of $737,268 and $1,343,421 as of March 31, 2011 and June 30, 2010, respectively | | 20,759,766 | | 33,195,201 |
| Inventories | | 2,896,877 | | 2,200,614 |
| Other receivables | | 64,387 | | 13,241 |
| Other receivable - related parties | | 251,955 | | 324,060 |
| Advances to suppliers | | 209,841 | | 260,688 |
| Financing costs | | 46,541 | | 435,634 |
| Total current assets | | 181,545,532 | | 156,350,911 |
| | | | | |
| **PLANT AND EQUIPMENT, NET** | | 13,469,481 | | 13,284,312 |
| | | | | |
| **OTHER ASSETS:** | | | | |
| Long term prepayments | | 30,470 | | 110,725 |
| Intangible assets, net | | 31,597,140 | | 32,594,326 |
| Total other assets | | 31,627,610 | | 32,705,051 |
| Total assets | $ | 226,642,623 | $ | 202,340,274 |
| | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | |
| **CURRENT LIABILITIES:** | | | | |
| Accounts payable | $ | 4,302,424 | $ | 4,113,219 |
| Short term bank loans | | - | | 2,209,500 |
| Notes payable | | 10,383,600 | | 11,135,880 |
| Other payables | | 658,454 | | 677,464 |
| Other payables - related parties | | 526,540 | | 255,595 |
| Accrued liabilities | | 2,128,719 | | 8,110,399 |
| Taxes payable | | 2,863,943 | | 6,259,271 |
| Refundable security deposits due to distributors | | 3,970,200 | | 3,829,800 |
| Liabilities assumed from reorganization | | 307,142 | | 524,614 |
| Derivative liabilities | | 1,218,616 | | 18,497,227 |
| Convertible debt, net of discount $1,833,267 and $13,669,752 as of March 31, 2011 and June 30, 2010, respectively | | 15,546,733 | | 12,210,248 |
| Total current liabilities | | 41,906,371 | | 67,823,217 |
| Total liabilities | | 41,906,371 | | 67,823,217 |
| | | | | |
| COMMITMENTS AND CONTINGENCIES | | | | |
| | | | | |
| **SHAREHOLDERS' EQUITY:** | | | | |
| | | | | |
| Convertible preferred stock Series A ($0.001 par value; 20,000,000 shares authorized, 0 shares issued and outstanding as of March 31, 2011 and June 30, 2010) | | - | | - |
| Common stock ($0.001 par value, 22,500,000 shares authorized, 13,692,179 and 11,701,802 shares issued and outstanding as of March 31, 2011 and June 30, 2010, respectively) | | 13,692 | | 11,702 |
| Additional paid-in capital | | 47,706,099 | | 30,846,915 |
| Capital contribution receivable | | (11,000) | | (11,000) |
| Retained earnings | | 119,559,930 | | 92,797,859 |

| | | | | |
|---|---|---|---|---|
| Statutory reserves | | 161,187 | | 159,278 |
| Accumulated other comprehensive income | | 14,213,653 | | 7,617,703 |
| Total shareholders' equity | | 184,736,252 | | 134,517,057 |
| Total liabilities and shareholders' equity | $ | 226,642,623 | $ | 202,340,274 |

## JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF INCOME AND OTHER COMPREHENSIVE INCOME
### (UNAUDITED)

| | For the Three Months Ended March 31, | | For the Nine Months Ended March 31, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| CONTINUIG OPERATIONS: | | | | |
| REVENUES | $ 18,109,343 | $ 25,571,389 | $ 69,199,820 | $ 68,135,385 |
| COST OF SALES | 6,070,653 | 6,974,455 | 20,331,519 | 17,901,903 |
| GROSS PROFIT | 12,038,690 | 18,596,934 | 48,868,301 | 50,233,482 |
| RESEARCH AND DEVELOPMENT EXPENSE | 233,145 | 1,093,440 | 1,426,425 | 3,299,400 |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES | 5,845,257 | 3,799,136 | 13,949,528 | 13,400,155 |
| INCOME FROM OPERATIONS | 5,960,288 | 13,704,358 | 33,492,348 | 33,533,927 |
| OTHER INCOME(EXPENSE): | | | | |
| Change in fair value of derivative liabilities | 2,754,749 | 11,624,079 | 15,078,239 | 13,490,071 |
| Other income - related parties | 83,672 | 80,652 | 247,748 | 241,956 |
| Non-operating income(expense), net | 338,540 | (5,790) | 392,443 | (220,061) |
| Interest expense, net | (2,539,807) | (6,643,163) | (13,649,378) | (15,562,981) |
| Total other income (expense), net | 637,154 | 5,055,778 | 2,069,052 | (2,051,015) |
| INCOME FROM CONTINUING OPERATIONS BEFORE PROVISION FOR INCOME TAXES | 6,597,442 | 18,760,136 | 35,561,400 | 31,482,912 |
| PROVISION FOR INCOME TAXES | 1,539,695 | 3,539,870 | 8,799,329 | 8,618,061 |
| INCOME FROM CONTINUING OPERATIONS | 5,057,747 | 15,220,266 | 26,762,071 | 22,864,851 |
| DISCONTINUED OPERATIONS: | | | | |
| Loss from discontinued operations-net | - | 36,000 | - | 200,769 |
| NET INCOME | 5,057,747 | 15,184,266 | 26,762,071 | 22,664,082 |
| COMPREHENSIVE INCOME | | | | |
| Net income | 5,057,747 | 15,184,266 | 26,762,071 | 22,664,082 |
| Unrealized gainon available-for-sale securities | - | 32,164 | - | 88,535 |
| Foreign currency translation adjustment | 1,177,397 | 509 | 6,595,950 | 197,393 |
| COMPREHENSIVE INCOME | $ 6,235,144 | $ 15,216,939 | $ 33,358,021 | $ 22,950,010 |
| BASIC WEIGHTED AVERAGE NUMBER OF SHARES | 13,486,711 | 11,419,991 | 12,818,593 | 10,965,346 |
| BASIC EARNINGS PER SHARE | $ 0.38 | $ 1.33 | $ 2.09 | $ 2.07 |
| DILUTED WEIGHTED AVERAGE NUMBER OF SHARES | 15,659,211 | 15,235,811 | 15,192,372 | 15,234,156 |

| DILUTED EARNINGS PER SHARE | $ | 0.22 | $ | 0.02 | $ | 1.76 | $ | 0.57 |

**JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**

| | For the Nine Months Ended March 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net income | $ 26,762,071 | $ 22,664,082 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation | 628,964 | 615,565 |
| Amortization of intangible assets | 2,155,483 | 1,194,331 |
| Amortization of debt issuance costs | 389,093 | 670,984 |
| Amortization of debt discount | 11,836,485 | 11,409,936 |
| Loss from discontinued operations-net | - | 200,769 |
| Gain from issuance of shares in lieu of cash interest payment | (396,152) | 318,936 |
| Interest expense payment of shares in lieu of cash | - | 4,457 |
| Bad debt (recovery) expense | (644,458) | 446,257 |
| Realized loss on sale of marketable securities | 3,241 | 406,346 |
| Unrealized (gain) loss on investments | 68,210 | (270,339) |
| Change in fair value of derivative liabilities | (14,961,390) | (13,490,071) |
| Stock-based compensation | 124,951 | 155,104 |
| Gain on legal settlement settled on shares | (91,495) | - |
| Changes in operating assets and liabilities | | |
| Accounts receivable | 14,068,839 | (8,813,521) |
| Inventories | (605,309) | (86,604) |
| Other receivables | (25,267) | 154,654 |
| Other receivables- related parties | 82,583 | (241,956) |
| Advances to suppliers | 58,967 | (273,373) |
| Long term prepayments | 82,906 | - |
| Accounts payable | 43,147 | (3,926,015) |
| Customer deposit | - | (1,026,480) |
| Other payables | 125,055 | 725,041 |
| Other payables - related parties | 265,247 | 712,114 |
| Accrued liabilities | (185,326 | 3,338,191 |
| Liabilities assumed from reorganization | (217,472) | (95,384) |
| Taxes payable | (3,564,035) | (6,308,625) |
| Net cash provided by operating activities | 36,004,338 | 8,484,399 |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Proceeds from sale of marketable securities | 51,313 | 531,750 |
| Purchase of equipment and building improvements | (114,454) | (76,977) |
| Purchase of land use right | - | (16,975,633) |
| Net cash used in investing activities | (63,141) | (16,520,860) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Change in restricted cash | 1,141,140 | (4,186,572) |
| Payments for bank loans | (2,252,250) | (2,199,600) |
| Proceeds from bank loans | - | 2,199,600 |
| Proceeds from notes payable | 17,781,889 | 19,173,180 |
| Principal payments on notes payable | (18,923,029) | (14,986,608) |
| Net cash used in financing activities | (2,252,250) | - |
| | | |
| EFFECTS OF FOREIGN CURRENCY EXCHANGE RATE FLUCTUATION ON CASH AND CASH EQUIVALENTS | 4,580,789 | 134,826 |
| | | |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 38,269,736 | (7,901,635) |

**CASH AND CASH EQUIVALENTS, END OF PERIOD**

|  |  |  |  |  |
|---|---|---|---|---|
|  | $ | 146,886,471 | $ | 96,464,482 |

SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION:

| | | | | |
|---|---|---|---|---|
| Cash paid for interest | $ | 61,176 | $ | 393,111 |
| Cash paid for income taxes | $ | 11,808,802 | $ | 2,631,495 |

NON-CASH INVESTING AND FINANCING ACTIVITIES:

| | | | | |
|---|---|---|---|---|
| Common stock issued for stock based compensation | $ | - | $ | 20,000 |
| Common stock issued to offset related party payable | $ | - | $ | 20,000 |
| Common stock issued for interest payment | $ | 6,281,031 | $ | 673,929 |
| Common stock issued for convertible notes conversion | $ | 8,500,000 | $ | 7,610,000 |
| Common stock issued for legal settlement | $ | 150,975 | $ | - |
| Derivative liability reclassified to equity upon conversion | $ | 2,200,370 | $ | 6,287,408 |
| Transfer of investments to settle liabilities assumed from reorganization | $ | - | | 1,133,807 |

JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
(FORMERLY GENESIS PHARMACEUTICALS ENTERPRISES, INC.)
RECONCILIATION OF NON-GAAP NET INCOME
(Unaudited)

| | For the Three Months Ended March 31, | | For the Nine Months Ended March 31, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| Net income for basic EPS - GAAP | $ 5,057,747 | $ 15,184,266 | $ 26,762,071 | $ 22,664,082 |
| Loss from discontinued operations | - | 36,000 | - | 200,769 |
| Unrealized loss (gain) on investments | 49,264 | (36,756) | 68,210 | (358,874) |
| Loss (gain) in change of fair value of derivative liabilities | (2,754,749) | (11,624,079) | (15,078,239) | (13,490,071) |
| Amortization of debt discount and issuance costs related to convertible debentures | 2,377,406 | 4,060,332 | 12,193,461 | 12,080,922 |
| Adjusted net income for basic EPS - non GAAP | $ 4,729,668 | $ 7,619,763 | $ 23,945,503 | $ 21,096,828 |
| | | | | |
| Net income (loss) for diluted EPS - GAAP | 3,484,343 | 289,703 | 26,750,602 | 8,759,605 |
| Loss from discontinued operations | - | 36,000 | - | 200,769 |
| Unrealized loss (gain) on investments | 49,264 | (36,756) | 68,210 | (358,874) |
| Loss (gain) in change of fair value of derivative liabilities | (2,754,749) | (11,624,079) | (15,078,239) | (13,490,071) |
| Adjusted net income (loss) for diluted EPS - non GAAP | 778,858 | (11,335,132) | 11,740,573 | (4,888,571) |
| | | | | |
| Basic Weighted Average Number of Shares | 13,486,711 | 11,419,991 | 12,818,593 | 10,965,346 |
| Adjusted basic earnings per share – non GAAP | $ 0.35 | $ 0.67 | $ 1.87 | $ 1.92 |
| | | | | |
| Diluted Weighted Average Number of Shares** | 15,659,211 | 15,235,811 | 15,192,372 | 15,234,156 |
| Adjusted diluted earnings per share - non GAAP | $ 0.05 | $ (0.74) | $ 0.77 | $ (0.32) |

** Including outstanding options and warrants using treasury method of calculation plus the number of shares if converted from the convertible debt

###

**Exhibit 99.2**

Dear Chairman Cao, Mr. Jin, and members of the Jiangbo Board of Directors,

With respect to the nomination by the members of Nominating and Corporate Governance Committee for my reelection as independent director at the company's forthcoming AGM, I would like to inform that committee, and the entire Board of Directors of Jiangbo, that I will not be standing for reelection as independent director at the forthcoming AGM when my current term expires. I have increasing professional commitments and will be unable to commit the appropriate time to Jiangbo in the future. Furthermore, I believe that as part of good corporate governance, the company should change its independent directors every few years and I am coming up the end of three years of service.

Provided the company continues to fulfill its obligations as a U.S. public company, I am willing to serve until the end of my current term and continue to assist the company with its endeavors in respect of the capital markets and the regulators in the U.S. until the AGM.

Please discuss with legal counsel how the proxy documents should be amended for this change in the composition of the board in preparation for, and at the time of, the company's AGM.

Regards,

Michael Marks

*Confidential*

June 6, 2011

Board of Directors
Jiangbo Pharmaceuticals, Inc. (the "Company")
25 Haihe Road, Laiyang Economic Development Zone
Laiyang City, Yantai
Shandong, China 265200

Board of Directors of Jiangbo Pharmaceuticals:

This letter is to inform you that I am resigning as a member of the Board of Directors of Jiangbo Pharmaceuticals, Inc., effective immediately.

It has been my pleasure to serve on the board for the benefit of the Company's shareholders. However, for the reasons detailed in writing to you in a separate letter of today's date, I feel the Company has made it impossible for me to fulfill my duties and that I have no choice but to resign.

It is my sincere hope that the Company can quickly rectify the circumstances that have occasioned my resignation.

Sincerely,

Michael Marks

Exhibit 99.4

*Confidential*

June 6, 2011

Board of Directors
Jiangbo Pharmaceuticals, Inc. (the "Company")
25 Haihe Road, Laiyang Economic Development Zone
Laiyang City, Yantai
Shandong, China 265200

Dear Members of the Board:

On behalf of the Audit Committee of the Board of Directors of Jiangbo Pharmaceuticals, Inc., I write to memorialize the following events and to inform you of the resignation of the independent members of the Audit Committee for reasons set forth below.

As you are aware, the Audit Committee charter authorizes the Committee "to retain independent legal, accounting or other advisers as it determines necessary to carry out its duties and, if necessary, to institute special investigations." The Company received a subpoena from the U.S. Securities and Exchange Commission ("SEC") on March 26, 2011. In response, the Audit Committee exercised its authority, with the Board's informed consent, to undertake an independent internal investigation of certain issues raised by the SEC and to provide the findings of that investigation to the SEC. The Audit Committee retained Cadwalader, Wickersham & Taft LLP ("Cadwalader"), a law firm that had done no prior work for the company, to conduct the independent investigation by, through, and at the exclusive direction of the Audit Committee. Jointly with Cadwalader, the Audit Committee retained Ernst & Young (China) Advisory Limited ("E&Y") to provide forensic accounting services in connection with the internal investigation at the direction of Cadwalader.

An independent investigation requires the complete and total cooperation from senior management. Unfortunately, the Chairman of the Board of Directors of Jiangbo and members of his management team have exhibited repeatedly their unwillingness to cooperate in even the most basic requests from the investigation team, despite numerous and repeated explanations by the Audit Committee and Cadwalader to explain the importance of this investigation and the expectations of the SEC.

As detailed below, the conduct and statements by the Company and those controlling and advising it have demonstrated a clear and continuing lack of cooperation over the past five weeks. Moreover, the manner and timing of the Company's payments to the Audit Committee's advisers (Cadwalader and E&Y) raise additional serious concerns regarding the veracity or correctness of banking information provided by the Company, and regarding the Company's ability and willingness to pay for necessary costs related to the internal investigation. As a result, the Audit Committee has determined that it can no longer effectively conduct an independent investigation as contemplated in the Audit Committee. The independent internal investigation has been halted, Cadwalader and E&Y have withdrawn from their respective engagements with the consent of the Audit Committee, and the independent members of the Audit Committee have determined to resign, effective today, as will be communicated in separate resignation letters to the Board of Directors.

-1-

*Confidential*

This letter clearly documents the reasons for these decisions and fully informs the Board of the Audit Committee's recommendations in light of these regrettable circumstances.

### *The Company's Uncooperative Response to the Independent Internal Investigation*

The following chronology describes in detail the substantial efforts taken by the Audit Committee, Cadwalader and E&Y to seek the cooperation of the Company in connection with the independent internal investigation, and the repeated and unreasonable failures of the Company to provide that cooperation.

- *April 19, 2011*: Michael Marks, chair of the Audit Committee, emailed Chairman Cao and Mr. Jin, the Company's CEO, regarding the failure of the Company to timely pay an initial retainers to Cadwalader and E&Y, and the importance of the internal investigation to the Company.

    - "Mr. Jin, thank you for confirming on our call last night at 10:30pm that you would make the relevant retainer payments to [Cadwalader] and E&Y this morning, and that the company is cooperating fully with the audit committee investigation. Please ensure payment is made promptly today as the professional advisors are unable to proceed without these payments, and this will look unprofessional in the eyes of the SEC with whom we now have regular contact regarding scope of work, timetable, etc."

    - "If this payment is not made **today** as promised to the audit committee last week, and again last night on the phone, then I will assume the company is not willing to cooperate with the audit committee's internal investigation and will have no choice but to resign as audit committee chair and independent director. I have sent repeated emails and text messages on this subject, and have also tried to call Mr. Jin on Friday and again yesterday, without any response. The ongoing failure of the company to recognize the importance of this investigation, and to fulfill its responsibilities as a U.S. public company, add additional risk and liability to all of us as directors and officers of the company."

    - "Please send me proof of the wire transfers ASAP today, so that I can notify [Cadwalader] and E&Y that we are proceeding with this investigation with the full cooperation of the company."

- *April 20, 2011*: Cadwalader and E&Y received initial retainers from the Company.

- *April 24, 2011*: Jacqueline Fan of E&Y met with Mr. Cao in Beijing to explain the investigative process generally.

- *April 25, 2011*: John Wang, independent member of the Audit Committee, Cadwalader partner Rocky Lee, and Ms. Fan met for one and one-half hours with Mr. Cao, Company

-2-

*Confidential*

counsel, and other Company representatives in Beijing to explain further the investigative process.[1]  During that meeting, Mr. Lee explained to Mr. Cao that:

- Cadwalader represents the Audit Committee, and not Mr. Cao nor the management of Jiangbo.

- The SEC expressed concern over the progress by Loeb & Loeb in response to the SEC's subpoena and indicated that the SEC was willing to consider the results of an independent investigation through a law firm that has not previously represented the Company.

- Cadwalader and E&Y's independence from management is absolutely critical to the SEC in order for the internal investigation to have any benefit for the Company.  Cadwalader and E&Y therefore report to the Audit Committee and take direction solely from the Audit Committee.

- The SEC had threatened additional action against the Company if Cadwalader and E&Y are not allowed to conduct a prompt and thorough investigation into the six areas that the SEC had identified.

- The SEC has a number of very drastic steps it could take against the Company if there is not an investigation to the SEC's satisfaction, including delisting the stock from trading on an exchange, possibly suing the Company on suspicion of wrongdoing, freezing assets in the US, and involving the Chinese Securities Regulatory Commission in the matter.   Adverse SEC actions may also trigger lawsuits by the plaintiff's lawyers against the company and individual officers and directors.

- It was therefore imperative that the Company, including management and employees, cooperate fully in the investigation by Cadwalader and E&Y, including providing any and all documents and information requested, being completely forthcoming and truthful, and ensuring that all relevant individuals associated with the Company are available for interviews when requested.

- The next two months were anticipated to be intensive, and the best thing management and the Company could do was to cooperate with Cadwalader's and E&Y's efforts.

- Cadwalader and E&Y would likely not be able to share much information with management during the course of the investigation. To ensure independence in the eyes of the SEC, there will be many things Cadwalader and E&Y must do without telling management, or without explaining to management the purpose of certain investigative steps.

---

[1] Other attendees at this meeting included George Zhou, of Beijing Tengzhong Investment Ltd., James Lei, of E&Y, and Frank Mariano and Cathy Xie, of Loeb & Loeb (the Company's counsel).

-3-

*Confidential*

- Cadwalader and E&Y would need to be paid timely in order to appropriately conduct the internal investigation and ensure independence. If the SEC thinks that management is withholding our payments to constrain the internal investigation, then the SEC will likely intervene and take over the investigation.

- Mr. Cao indicated to Mr. Lee and Ms. Fan that he understood and appreciated the information and explanation, and pledged his full support of the internal investigation.

- *Week of April 25, 2011*: E&Y arrived on-site at the Company on April 25 and delivered to the Company its initial requests for documents and information.[2]

  - Information requested included, among other things: a list of individuals employed during the period under investigation; bank account information and bank statements; information relating to the Company's IT environment; list of employees' company email addresses; contact information of the Company's web-based email service provider; list of Company computers and their respective users; and a walk-through of documents used in relation to the Company's sales, purchases, production and warehouse processes.

  - Many of these requests were critical initial requests necessary for Cadwalader and E&Y to understand what further steps to take regarding the potential preservation, collection and review of relevant materials, and to identify potentially relevant witnesses.

  - During the week, E&Y met with members of management in an effort to explain the requests and to obtain necessary materials as requested. E&Y also requested to conduct initial discussions with relevant personnel and to conduct walk-through interviews in relation to the Company's sales, purchases, production and warehouse processes.

  - Yuanfeng Fu, the Company's Controller, initially indicated to E&Y that certain requested documents (e.g., a list of historical employee list, a list of employees' company email addresses; contact information of the Company's web-based email service provider) were not available. Mr. Fu informed E&Y subsequently on May 3, 2011 that he had this information but that Mr. Cao did not agree to release these materials to Cadwalader and E&Y.

- *April 30, 2011*: By the end of this week, E&Y informed Cadwalader and the Audit Committee of significant difficulties in obtaining necessary information and documents from the Company. Company employees had informed E&Y that Mr. Cao had to approve the release of any materials to Cadwalader and E&Y, and that he was not, at that

---

[2] A list of the documents and information requested that are still outstanding as of June 2, along with their original request date, is attached hereto as Exhibit A.

*Confidential*

time, willing to provide information that would not otherwise be available to outside auditors.

- Although the Company provided some information as requested that week, none of the information itemized above was provided.

- As described below, some portions of this requested information was provided only at the end of May and beginning of June, but a number of these initial requests remain outstanding or incomplete as of June 3, 2011.

- *May 3, 2011*: Mr. Jin, the Company's CEO, requested a copy of E&Y's engagement letter with the Audit Committee in order to share the letter with Mr. Cao. Cadwalader instructed E&Y to refrain from sharing the engagement letter with management in light of the potential impact on the independence of the investigation.

- *May 3, 2011*: The Audit Committee and Mr. Lee participated in a lengthy call with Mr. Cao to discuss the Company's apparent unwillingness to provide materials to E&Y and Cadwalader as requested.

  - Mr. Cao explained to the Audit Committee that he did not understand why E&Y requested certain documents or how those materials were within the scope of the investigation.

  - Mr. Cao further explained to the Audit Committee that he was not willing to provide materials to Cadwalader and E&Y that were beyond the scope of a regular audit.

  - The Audit Committee and Mr. Lee reiterated the purpose and process of the internal investigation, and the paramount importance of the Audit Committee's independence. The Audit Committee and Mr. Lee also explained that the internal investigation was more in-depth than a normal audit, and that independence required that management should not attempt to negotiate the scope of the investigation.

  - Mr. Cao requested to understand in detail the scope of the internal investigation. The Audit Committee and Mr. Lee took that request under advisement, but reiterated the need for independence and implored Mr. Cao to cooperate fully with the internal investigation for the reasons previously discussed at length.

- *May 4, 2011*: Mr. Fu informed James Lei of E&Y that Mr. Cao had not agreed to release information requested by E&Y. Thereafter, Mr. Lei met with Mr. Cao in person in Laiyang to explain to Mr. Cao the importance of E&Y receiving the information requested.

  - Mr. Cao indicated to Mr. Lei that he would not provide access to information or materials that were beyond the scope of a normal audit, without again discussing the investigation with the Company's Audit Committee.

-5-

*Confidential*

- Mr. Cao indicated in particular that he remained unwilling to give E&Y information and materials relating to the Company's computer and IT information, systems and vendors, and email addresses. Mr. Cao indicated that he was concerned that the internal investigation would "seize" materials that would impact privacy concerns and/or the Company's business.

- Mr. Cao told Mr. Lei that he was unwilling to reveal any details regarding the Company's acquisition of land use rights, or any information, including employee lists or sales information, that might tend to raise issues regarding the propriety of payments relating to sales and marketing.

- *May 5, 2011*: E&Y requested information from Ms. Sung, including, for example U.S. bank account and bank statement information. Thereafter, Ms. Sung informed E&Y that, Mr. Jin, the CEO, required her to update him regarding what E&Y had requested. Ms. Sung further explained that Mr. Jin informed her that the Company had not authorized her to share Jiangbo materials with E&Y or Cadwalader and that Mr. Jin instructed her not to provide any materials until further notice from the Company.

- *May 6, 2011*: Ms. Fan spoke with Mr. Jin and Mr. Fu. They explained to Ms. Fan that, per Mr. Cao's instructions, other than certain bank information, the Company would not provide any other information to E&Y or Cadwalader (even if the items would be considered reasonable under a normal audit), until: (1) Mr. Cao was able to review the E&Y engagement letter in order to understand precisely the scope of work and the payment terms of the engagement and (2) Mr. Cao understood the scope of work and why certain information was required as part of the investigation.

  - Mr. Fu also explained to Ms. Fan that he had already prepared other information that E&Y had requested, but that Mr. Cao had specifically instructed him not to release those materials.

- *May 6, 2011*: Mr. Marks sent an email to, among others, Mr. Cao and senior Company management. In the email, Mr. Marks explained the following

  - "Following our call with Mr. Cao [on May 3], John Wang and I did have a call with [Cadwalader] and E&Y, and have requested them to draft a memorandum to the company, explaining the scope of work and the reasons for the requested materials, to the extent that it is appropriate to do so. [I]t is not appropriate to share the detailed engagement letter with the company, [because] this would interfere with the independence of the investigation in the eyes of the SEC. Please understand, there is no legal obligation for the audit committee or [Cadwalader] to produce this memo, or explain ourselves to the company, and this is only being done as a courtesy and in the spirit of cooperation, to enhance the company's understanding of the process. Hopefully this memorandum can be completed today and sent to the company as soon possible. Then, combined with the all-parties phone call suggested above, we can help the company understand the importance of the investigation, the independent nature of the investigation, and the relevance of the requested materials."

*Confidential*

- "This back and forth between company management and E&Y regarding scope of work, approving of requested materials, etc. is a waste of time and is costing us days and days against a tight deadline set by the SEC. The company should not be 'negotiating' which materials it is willing to share and which it is not, and should not be unreasonably withholding information or access to internal staff or third parties. The investigation needs to be able to run independently and efficiently, without undue influence from management. Also, in terms of running a true independent investigation, the company should not interfere at all with respect to defining scope of work, or approving or refusing requested materials. Hopefully the memorandum mentioned ... above, combined with the all-parties phone call ..., we can help the company understand the importance of the investigation, the independent nature of the investigation, and the relevance of the requested materials."

- *May 6, 2011:* Mr. Jin emailed Mr. Marks and explained that the Company had concerns about the scope and costs of the investigation, and that Mr. Jin would not authorize payment for any investigative work that he thought was unnecessary.

  - "Dear Mr. Michael [*sic*] and Audit Committee, being the CEO of Jiangbo Pharmaceutical, I present that all the staff of my company will completely cooperate with the work of the auditors, attorneys and audit committee according to US and PRC regulations. I just require that this special purpose audit to be conducted under laws (particularly Chinese laws), fair, reasonable, and based on facts. Meanwhile, please make it cost efficient as the cost will be borne by the company's shareholders and I have the duty to guard for their interests. I just want to make the audit and pay for it within the range we have previously co-decided. I will not and do not permit any additional payment for the workload of this time undue audit."

- *May 7, 2011:* Mr. Marks emailed Mr. Cao and Mr. Jin to reiterate the importance of the Company's cooperation.

  - "We fully appreciate your concerns and issues raised. Please understand that in terms of the law and SEC practice, the company is not allowed to influence the scope of work in any way. This is what an independent investigation means. The company is not even allowed to refuse confidential or proprietary information, because the SEC has the right to access confidential information. With respect to costs, the company is currently causing the investigation to suffer a far longer and less efficient process, which is already resulting in additional costs. And if the investigation is prevented or slowed down in any way, this will result in a far great cost and liability for shareholders, management, and staff. Hopefully the lawyers and E&Y can make these points clearer to you and Mr. Cao on the phone call this morning and the company can continue to cooperate fully with the investigation."

- *May 7, 2011:* The Audit Committee, Cadwalader, and E&Y participated in a three-hour phone call with Mr. Cao and senior Company management. Brad Bondi, a partner with

-7-

*Confidential*

Cadwalader, and others on the investigation team, explained generally the scope of investigative work that was agreed-upon by the SEC and explained in detail the process of an internal investigation, the importance of document preservation and collection, the importance of independence in the internal investigation, and the importance of the Company's cooperation. The Audit Committee shared with Mr. Cao a memorandum (translated into Mandarin Chinese) that Cadwalader wrote to explain these issues, as referenced in Mr. Marks' email of May 6.[3]

- Mr. Cao indicated that he understood and appreciated the necessity for the internal investigation and its independence, and agreed to ensure that the Company cooperated with the investigation and provided the materials requested.

- *May 9, 2011*: Mr. Fu informed Ms. Fan that he had not received any new instructions from Mr. Cao, and therefore would not provide any information to E&Y until further notice.

- *May 11, 2011*: E&Y provided an updated document request list to the Company, highlighting the outstanding items still necessary for the conduct of the independent internal investigation.

- *May 12, 2011*: In response to the updated document request list, Mr. Fu explained to E&Y that Mr. Cao had again instructed the Company not to provide any materials to E&Y, including those only relating to normal financial audit.

  - Per Mr. Fu, Mr. Cao explained that he never came to a complete agreement at the end of the conference call on May 7, despite his statements during the call to the contrary.

  - Mr. Fu explained that Mr. Cao still thought that certain documents were not necessary for the internal investigation.

  - Mr. Fu further explained that Mr. Cao was reviewing in detail the Cadwalader memorandum of the investigation topics in an effort to determine the reason for each item on the document request list.

  - Finally, Mr. Fu mentioned specifically that Mr. Cao did not want to provide information regarding emails and computers, and that Mr. Cao did not think that further supporting documents related to RMB 200 million payment needed to be provided because he believed the referenced transaction was unrelated to Jiangbo.

  - In addition to the Company's unwillingness to provide requested documents, the Company's employees also demonstrated non-cooperation during E&Y's continued attempts to obtain relevant information and materials on-site at Jiangbo. For example:

---

[3] This memorandum is attached as Exhibit B.

*Confidential*

- E&Y called Anji Li, Manager of Production Department, and requested to perform a walk-through interview relating to the Company's production processes. Mr. Li indicated that he was too busy to prepare walk-through documents and then abruptly hung up the phone and refused to answer E&Y's questions. E&Y could not reach Mr. Li thereafter.

- Pengfei Gai, Manager of Materials Department, refused to respond to E&Y's requests to perform walk-through in relation to purchasing and warehousing processes and to perform physical visits to where Goods Delivery Notes and Goods Receipts Notes were printed out and where the historical document were archived. Gai refused to leave the employee wash room in order to avoid answering E&Y's questions.

- Mr. Fu refused to provide E&Y with necessary contact information or to arrange interviews with relevant sales personnel necessary for E&Y to obtain a general understanding of the Company's sales' activities.

- *May 12, 2011*: Ms. Sung indicated to Cadwalader that before the Company would authorize E&Y and Cadwalader to collect any Jiangbo-related materials in her possession, the Company required a list of the specific items that E&Y and Cadwalader were requesting. Because E&Y and Cadwalader were not permitted to review her materials, they necessarily could not identify with particularity what materials might be subject to the SEC's preservation requirements, or which of those materials Cadwalader and E&Y may need to review as part of the internal investigation.

- *May 13, 2011*: The E&Y team determined that it was futile to continue on-site field work until the Company provided the requested documents, information and access.

- *May 13, 2011*: Mr. Lee reached out to Mr. Cao to discuss status of Company's response to the investigation. The call did not take place until May 17 because of Mr. Cao's travel schedule. In the meantime, no additional documents or information were provided to E&Y or Cadwalader.

- *May 16, 2011*: Mr. Fu informed E&Y that there were no further instructions from Mr. Cao to provide any further documents or information.

- *May 17, 2011*: Mr. Marks emailed Mr. Cao and Mr. Jin regarding the status of the internal investigation. Mr. Marks explained the Company's continuing lack of cooperation, and the potential serious consequences if cooperation was not forthcoming immediately:

  - "The audit committee met several times on this over the past few months, and more specifically prior to the engagement of both [Cadwalader] and E&Y, and determined the scope of work and fees to be paid. The audit committee acted fully within its authority as described in the audit committee charter. The company's obligation is to pay the fees and to cooperate with the work and

*Confidential*

documents requested. The company is not allowed to interfere with the scope of work, fees, documentation requests, etc."

- "Furthermore, we have learned from [Cadwalader] and E&Y that the company has stopped its cooperation with the investigation. We understand Mr. Cao has instructed Mr. Fu not to provide any further documents to [E&Y] as of last week, and per [E&Y's] discussion with Mr. Fu, the [E&Y] team did not return to the field on Monday this week as initially scheduled. This is unacceptable, and we have spent countless hours trying to explain to management the potential and highly likely negative consequences of this failure to cooperate, not to mention the additional fees and expenses incurred in wasting [E&Y's] and [Cadwalader's] time. If this situation is not rectified, and the company continues to withhold documents requested by [E&Y], and refuses to pay fees as and when they are due, then we will have no choice but to report to the SEC that the company is not cooperating with the investigation and we will stop our own investigation. At that stage, I will also inform the company and the SEC that I am no longer willing to serve as audit chair. This will likely cause the SEC to take very severe action against the company. Please advise immediately your willingness to proceed with the investigation, including the scope of work as defined by the audit committee, and the provision of ALL documents requested by [E&Y] on a timely basis."

- *May 17, 2011*: Mr. Lee and Mr. Cao discussed the status of the investigation by phone. Mr. Lee again explained the purpose and process involved with respect to the internal investigation. Mr. Lee also explained that the cost of the internal investigation was likely to be significantly more than the initial retainer received by Cadwalader.

  - Mr. Cao indicated that (1) he intended to and wished to cooperate fully; and (2) the Company would pay for the costs of the investigation, but that he wished to meet with Mr. Lee in person again to discuss the matter further.

  - Mr. Cao agreed to talk with Mr. Lee further on May 18 in person in Beijing.

- *May 18, 2011*: Mr. Lee met with Mr. Cao in Beijing, and Mr. Cao informed Mr. Lee that the Company was not completely committed to progressing or completing the investigation. Mr. Cao asked Mr. Lee for one day so that Mr. Cao could consider the Company's position with respect to the internal investigation.

- *May 19, 2011*: Mr. Fu emailed Mr. Lei and indicated that Mr. Cao would discuss with Company's legal counsel before providing any of the requested documents.

- *May 19, 2011*: Mr. Marks requested an emergency Board meeting to discuss the current status of the investigation. Mr. Marks indicated his concern that the Company was not committed to progressing or completing the investigation. He also reminded Board members of the potential severe consequences of the Company's lack of cooperation.

  - "As we have noted previously, stopping the independent investigation will have immediate and severely negative consequences and potential liability for the

*Confidential*

company as well as for individual directors, managers, and staff of the company, including SEC legal action, NASDAQ legal action, investor legal action, substantial loss in market value, etc. If the company is not willing to cooperate with the independent investigation and fulfill its obligations as a U.S. public company, I will also no longer be comfortable to continue to serve as independent director and audit chair."

- *May 19, 2011*: There was a three-hour emergency meeting of the Board of Directors, which dealt with the status of the Company's response to the internal investigation. The meeting covered again the scope of the investigation, the importance of document collection and preservation, the importance of independence, and the need for the Company's full cooperation. The directors also discussed the potential ramifications if the Company was unwilling to conduct or complete the internal investigation in an appropriate manner

- *May 20, 2011*: Mr. Marks sent an email to the Board of Directors outlining the necessary "critical steps" required as part of the internal investigation to be completed that same day.

  - "If the immediately critical steps [described below] are not completed by **6pm today, Friday May 20th, 2011**, I will resign as audit chair of the company effective immediately, informing CWT and E&Y that the company is not willing to cooperate with the independent investigation, and that they should inform the SEC of this fact."

    - Chairman Cao calls Rocky Lee at CWT today and confirms Jiangbo's commitment to complete the investigation and pay the related fees on time.

    - Jiangbo pays the current outstanding invoice for CWT today, and emails me proof of payment today.

    - Jiangbo pays the current outstanding invoice for E&Y today, and emails me proof of payment today.

    - Jiangbo provides authorization to Elsa Sung to provide information requested by E&Y and which Elsa has already prepared but has communicated that Jiangbo's authorization has not been obtained.

    - Jiangbo informs Elsa Sung to release her personal computer for imaging (Elsa herself already agreed to this).

    - Jiangbo authorizes CWT's access to Frazer Frost's workpapers.

    - Jiangbo provides to E&Y immediately today the following critical and outstanding information:

*Confidential*

- List of employees' company email address

- The contact information of Company web-based email service provider

- List of officers and directors that use personal email accounts for Jiangbo business and their personal email addresses.

- List of computers and users

- A list of company bank accounts (including closed bank accounts and brokerage account)

- Bank statements for the covered periods

- Notes Payable Deposit Contract

- Bank acceptance bill stubs

- Bank acceptance bill register

- Yantai Jiangbo Pharmaceuticals' bank slips of its receipt of RMB 200 million

- Hilead's bank slips of its receipt of RMB 200 million, and relevant journal vouchers

- Report on the verification of capital in relation to the RMB 200 million capital increment of Hilead

- *May 20, 2011:* The Company did not fulfill the "critical steps" described by Mr. Marks in his May 20 email. Mr. Marks refrained from immediately resigning based only on Company counsel's request for more time.

  - Eugene Licker of Loeb & Loeb ("Loeb") emailed Mr. Marks in connection with the Company's lack of cooperation and indicated: "I know. I understand. I am dealing with this with many China-based companies. Once again. I wish I had involved myself earlier but I did not know there were issues. Sometimes what you need is an intermediary for a lot of reasons, most of which you understand better than I do. I promise not to needlessly prolong matters and to make myself available. I just ask that you hold off drawing lines in the sand and give me a chance to try to get things moving. I told Mr. Cao how terrific you have been with the SEC, and as an Audit Committee chair, and I meant it. Let's all try to keep moving forward."

  - Mr. Marks responded to Mr. Licker: "Thanks for your efforts. We also had a 3-hour full board meeting until past midnight last night. I believe the company can

-12-

*Confidential*

still fulfill its obligations here and make use of the assistance of the audit committee [Cadwalader and E&Y]. But on the other hand we have done nothing but "discuss" the past 2 weeks, and we are all really exposed now. I sent the company several time-critical tasks this morning which need to be completed by today to show their commitment to the investigation. It is the only way for the company to show a real commitment rather than broad, endless rhetoric. My assessment as to whether to continue as independent director will be based on the company's response to these issues."

- *May 23, 2011*: Mr. Fu emailed Ms. Fan and indicated the following: "The Company, Chairman Cao, Mr. Jin and I are willing to cooperate with the investigation, and we also would like to see our cooperation go smoothly. However, based on Chinese law and advice from our Chinese counsel, certain documents requested by you may impact employee privacy, with potentially legal risks. It would not be convenient for us to provide such documents. Hope you understand. Thanks."

  - Thereafter, E&Y called Mr. Fu for further clarification. Mr. Fu indicated that (1) per his understanding, Loeb would reach out to Cadwalader that evening to discuss the document request list, and (2) Mr. Jin was still discussing with Mr. Cao regarding payment of Cadwalader's and E&Y's outstanding invoices.

- *May 23, 2011*: Mr. Lee and Mr. Cao again discussed the status of the investigation, and the potential costs.

  - Mr. Lee explained that the continuing difficulty in obtaining materials, and Mr. Cao's indications that he was not comfortable with the potential costs of the investigation, raised concerns for Cadwalader and E&Y that substantial fees that were about to be incurred may not be paid and, if fees were paid, that the investigation would not be able to obtain information and materials necessary for completion. Mr. Lee explained that in light of these factors, Cadwalader found it necessary to request an additional retainer. Mr. Cao asked for an upper estimate of potential fees, and Mr. Lee suggested that a retainer of three installments of 5mm RMB was likely to cover all anticipated costs of the internal investigation, but that any unused amounts would be returned to the Company.

  - Mr. Cao agreed to the additional retainer, and vowed to cooperate with the internal investigation.

- *May 23, 2011*: Mr. Lee emailed Mr. Cao reminding him of his agreement to pay the additional retainer installment for the reasons previously discussed. Mr. Lee warned Mr. Cao of the potential impact of the Company's failure to commit appropriate funds:

  - "We hope that Jiangbo will complete the RMB 5 million advance payment by the close of business Tuesday [May 23]. If we have not received payment we will need to inform the SEC of this delay in Tuesday's phone call and thereafter resign as the investigator. The SEC has customarily regarded delay or rejection of payment as one of the significant facts showing an investee's attitude of being

-13-

*Confidential*

uncooperative. If we are required to resign the SEC would take over the investigation ... resulting in significant harm to Jiangbo."

- *May 23, 2011*: The Company did not pay the additional agreed-upon retainer.

- *May 24, 2011*: Mr. Marks emailed Mr. Licker regarding the status of the Company's response to outstanding requests for information and fees.

  - "Do you have any further update from your side? The company told us that the chairman would meet with Loeb in Beijing on Monday, and that they are committed to continuing the investigation. However, E&Y has still not received any further info, has stopped work for almost two weeks now, and [Cadwalader] is chasing fees and communication from the company."

- *May 24, 2011*: Mr. Licker informed Cadwalader that Loeb would act as a liaison with respect to the internal investigation and that all communications should be conducted through him, and not directly with Mr. Cao.

- *May 25, 2011*: The Company paid the outstanding invoices of Cadwalader and E&Y (totaling approximately RMB 1.7 million).

  - The first tranche of Cadwalader's April fee was paid from a personal account of an individual named                     (the name of a cashier at Jiangbo), via internet banking.

  - E&Y had previously asked Mr. Fu whether the Company uses internet banking, and Mr. Fu had responded that the Company did not use and did not have access to internet banking.

- *May 25, 2011*: Mr. Jin later emailed Mr. Lee regarding the status of the Company's payment of the agreed-upon retainer.

  - "First, I would like to thank you for your kind support and help to Jiangbo. The management team of Jiangbo has been trying best to cooperate on the investigation, and has been actively discussing and working on the fee issues. We are in the process of making payments as requested. As you may know, there is some procedures that the company must go through to make the payment, which may take some time to execute. We would like to thank you for you kind understanding of the duration that might caused. If you have any questions, please feel free to contact me via email or phone. We can discuss over the phone on the fee issues if necessary."

- *May 25, 2011*: Mr. Bondi and Tom Kuczajda, a special counsel with Cadwalader, discussed with Mr. Licker by phone the Company's continuing lack of cooperation, the Company's apparent unwillingness to commit to pay the costs associated with the internal investigation, and the outstanding requests for documents.

-14-

*Confidential*

- Mr. Licker asked that Cadwalader reconsider the additional retainer request, but indicated that he would work with the Company to ensure all outstanding requests for documents and information would be fulfilled as soon as possible.

- Mr. Licker also indicated that it was his position that any and all information collected as part of the internal investigation, including interim findings, were privileged, and that the Audit Committee was not authorized to provide any such information to the SEC.

- *May 25, 2011:* Cadwalader again requested to collect materials from Ms. Sung. She reiterated that, although she had no objections, the Company would not authorize the collection of any of her Jiangbo-related materials without a list of what Cadwalader and E&Y intended to collect.

  - Mr. Kuczajda emailed Mr. Licker and explained that the objective of collecting Ms. Sung's materials was "simply [to] preserve all Jiangbo-related materials, and only Jiangbo-related materials, on Elsa's computer, emails and in hard copy, that are in her possession," and that "we will review the materials collected only to the extent those materials relate to the topics which are the subject of the internal investigation, and only as authorized by the Audit Committee."

- *May 25, 2011:* Mr. Marks and Mr. Wang informed the Company of their intention not to stand for re-election to the Board.

- *May 26, 2011:* Mr. Wang emailed the Board of Directors in response to a request from the Company to publicly disclose that Mr. Marks and Mr. Wang had no differences with the Company.

  - Mr. Wang indicated that he has several disagreements with the Company, including that he "believe[d] the Company should comply with the requests by E&Y and [Cadwalader], including but not limited to the requests for Elsa's computer and a list of all the computers and emails used by employees for business purposes." As described below, Mr. Marks seconded these comments on May 27, 2011.

- *May 26, 2011:* E&Y followed up with Mr. Fu regarding the status of outstanding requests. Mr. Fu indicated that an internal company meeting was scheduled for that evening to discuss the status of the investigation and the outstanding information/document requests, but that no additional documents or information would be currently forthcoming.

- *May 26, 2011:* Mr. Lee and Mr. Cao again discussed by phone the status of the investigation and the agreed-upon retainer.

  - Mr. Cao suggested breaking the first RMB 5 million retainer payment into two separate payments of RMB 2.2 million and RMB 2.8 million with the

*Confidential*

first payment being paid May 30, and the latter payment being paid within one month. Cadwalader agreed to this further installment payment request.

- Within an hour of the conversation with Mr. Cao, however, Mr. Lee was informed by Mr. Jin that the Company was still considering whether to pay the requested additional retainer at all.

- *May 26, 2011:* Mr. Licker emailed Mr. Lee and indicated that the Company would honor its payment obligations only as set forth in the written engagement letter.

- *May 27, 2011:* Mr. Marks emailed the Board of Directors in response to a request from the Company to publicly disclose that Mr. Marks and Mr. Wang had no differences with the Company. Mr. Marks referred to Mr. Wang's prior email to the Board, and wrote:

  - "I second John's concerns about the lack of professionalism within the company over many years of delayed payments, lack of focus of senior management, commitment of company resources to related parties, treatment of professional service providers and company executives, etc. I am also completely dissatisfied as a result of the recent experience with respect to the long delays and attempted interference with the scope of the internal investigation which are causing the company and all of us as individuals to be at increased risk and to bear further time and cost than if the company had cooperated fully the past month. For example, even though I have seen many emails from you this week telling the lawyers that the company will cooperate with the investigation, I hear from E&Y last night that they are still waiting for the outstanding materials which Mr. Fu has prepared but which Mr. Cao has not yet approved for release. This is again a sign of Mr. Cao's interference with the scope and process of the investigation. These materials should be delivered immediately today to E&Y so that they can recommence their investigation after two weeks of delay. As it stands right now, [Cadwalader] already has to report our delays to the SEC, which is likely to result in additional subpoenas, revisiting Elsa's testimony, and other negative consequences for the company which could have been avoided if the company stood by its verbal commitment to cooperate with the investigation by actually delivering outstanding documents and retainer payments."

  - "With the above in mind, I am therefore still reserving my right to resign immediately at any time over the next month if the company does not cooperate fully with the independent investigation, or does not fulfill its obligations as a U.S. public company in any other way. If the company continues to comply with the internal investigation, I will simply stand down at the AGM at the end of June, which has less of an impact for the company in the immediate and long term. With this in mind, I am not willing to confirm right now the statement you wish to include in the 8K."

- *May 27, 2011:* Mr. Marks contacted Mr. Jin and Mr. Fu to encourage the Company to cooperate. Mr. Jin and Mr. Fu indicated that they were waiting on further instructions from Mr. Cao. In addition, E&Y again followed up with Mr. Fu regarding the status of

-16-

*Confidential*

outstanding requests. Mr. Fu indicated to E&Y that Mr. Cao had not attended the internal Company meeting on May 26, and therefore there was no further decisions or instructions from Mr. Cao.

• *May 27, 2011*: Ms. Sung indicated to Cadwalader that she had been authorized to permit Cadwalader and E&Y to examine and review the Jiangbo-related materials in her possession. Ms. Sung and Mr. Licker suggested that arrangements be made to limit Cadwalader and E&Y involvement in order to keep costs down. Cadwalader suggested accommodations, including having Ms. Sung travel to New York or Washington, D.C., to reduce travel costs, but stressed the desire to collect the materials as soon as possible. Cadwalader suggested that Cadwalader and E&Y meet with Ms. Sung on June 1 in either Florida, New York, of Washington, D.C., to examine and collect the materials. No final arrangements for the collection of these materials were set.

• *May 27, 2011*: At the end of the day in China, E&Y received from Mr. Fu some of the materials previously requested. However, some of the information remained incomplete, and the Company still flatly refused to provide other information. For example:

  • the Company refused to provide documents relating to the Company's sales, purchases, production and warehouse processes because the Company and the Company's legal counsel deemed those materials irrelevant to the investigation;

  • the Company's response to a request for a full historical employee list contains only sixteen names and the dates of employment are not specified;

  • the Company's response to a request for company email addresses contains only fourteen email addresses;

  • the Company's response to a request for a list of personal email addresses used by employees for Jiangbo business purposes contains only two names.

• *May 27, 2011*: Mr. Lee emailed Mr. Licker and explained the current status of the investigation, the Company's cooperation, and the agreed-upon additional retainer.

  • "We are now at a point where we must decide whether to continue forward or withdraw. In order for us to continue forward and to ensure our independence, however, we cannot be always arguing over payments from the company to complete our necessary work. That is why we requested the advancement from the company, and any unused funds would be refunded to the company. This is not a fixed fee; it is an advancement of a retainer for necessary investigative work that is scheduled to take place and to ensure our independence. We have a call scheduled with the SEC on Monday [May 30]. If we do not receive the first installment of the retainer in the amount of RMB 2.2 million by 6:00 pm China Standard Time, we will have no choice but to withdraw from this representation and notify the SEC of our withdrawal on our scheduled call with the SEC on Monday, New York Eastern Standard Time. You have given us no other choice."

-17-

*Confidential*

- *May 30, 2011*:  The Company failed to pay the agreed-upon retainer; and documents and information previously requested remained outstanding.

  - Mr. Fu emailed Cadwalader, indicating that Mr. Cao would make the payment of the first installment of the agreed-upon retainer on May 31.

- *May 31, 2011*:  The Company again failed to pay the agreed-upon retainer; and documents and information previously requested still remained outstanding.

  - Mr. Fu informed Cadwalader that the Company's bank did not want the Company to make any payments at the end of the month because the bank was completing its account settlements.

  - Mr. Cao told Cadwalader that the funds would be wired on June 1. Mr. Cao also indicated that he would unconditionally release all documents requested by E&Y and Cadwalader.

- *June 1, 2011*:  The Company again failed to pay the agreed-upon retainer; and documents and information previously requested still remained outstanding.

  - Mr. Licker informed Cadwalader that Mr. Cao had given his word that the RMB 2.2 million retainer would be paid "first thing in the morning."

- *June 1, 2011*:  Mr. Fu told E&Y that the Company would provide all outstanding documents, but indicated that he wanted E&Y to send a more detailed document request list to him (despite the fact that the materials had been requested weeks ago, and despite numerous meetings with E&Y regarding the requests). Mr. Fu also indicated that certain documents could only be reviewed on site. E&Y provided a detailed document request list to Mr. Fu, and also had several telephone calls with Mr. Fu during the day to provide clarifications to questions raised by Mr. Fu regarding certain items in the document request list.

- *June 1 and 2, 2011*:  E&Y received some additional materials from the Company, but E&Y's document request list remained unfulfilled.

  - As of June 2, 2011, the following information and documents had not yet been provided and were *still outstanding*:

    - Bank statements retained by the Company for large portions of the review period relating to several bank accounts;[4]

---

[4] The following bank statements have not yet been provided: [1] .                July 2008 to December 2008, January 2010 to March 2010, May 2010, July 2010, August 2010, November 2010;  [2]            July 2008 to December 2008, April 2009; and [3]                          LLP: all bank statements for the review period *except* January 2009 to March 2009, July 2009 to December 2009, January 2010 to October 2010, and January 2011 to March 2011.

*Confidential*

- the Company's authorization and arrangements for E&Y to obtain bank statements and bank confirmations independently from certain banks;[5]

- Auditor's Verification Report on the capital injection in relation to the RMB 200 million capital of Hilead;

- 2010 medicine tendering documents;

- Foreign currency receipt clearance documents in China in relation to the receipt of the foreign currency notes and debentures;

- Material Request Form and material demand plan for October 2009 to December 2009;

- Documents relating to one of the two interest payments for its November 2007 Debenture and May 2008 Notes; and

- Material Request Form and material demand plan for October 2009 to December 2009.

- In addition, E&Y had not yet had access on-site to 147 sample vouchers requested on May 13, 2011 and 63 sample vouchers requested on June 1, 2011

- As of June 2, 2011, the following information and documents were *provided incompletely and/or raised questions regarding the thoroughness and accuracy of the Company's response*:

  - The Company purported to provided a historical employee list, but the list provided does not include complete department and position information;

  - The Company purported to provide a list of employees' company email addresses, but included a list of only fourteen email addresses, even though the Company has 456 employees according to the current employee list;

  - The Company purported to provide the name of the Company's web-based email service provider, and indicated that the provider was located in Yantai, even though the Company had previously indicated that the Company used a vendor based in Beijing;

---

[5] The following bank statements and confirmations have not yet been provided by certain banks: (1) bank statements for Laiyang Jiangbo and Genesis Jiangbo's accounts at ˙                        (2) bank statements for Genesis Jiangbo's two accounts ended with ˙          and          respectively at          (3) the bank confirmation for Genesis Jiangbo's two accounts ended with          and          respectively at

-19-

*Confidential*

- The Company purported to provide a list of officers and directors that use personal email accounts for Jiangbo business and their personal email addresses, and included only two names. However, E&Y had observed on-site a contact list posted in Jiangbo's Finance Department with more than ten personal email addresses. In addition, the Finance Supervisor, Mr. Zhou, used his personal email address for correspondence with E&Y;

- The Company purported to provide a list of Company computers and users. Per the fixed asset list provided by the Company on April 25, 2011, there are six computers located at Hilead, whereas the computer list provided recently by the Company does not list any computers located at Hilead;

- The Company purported to provide a list of Genesis Jiangbo's bank accounts, but the number of bank accounts provided is inconsistent with the number of bank accounts previously identified to E&Y by Ms. Sung;

- The Company purported to provide a list of foreign currency notes and debentures, but the list provided does not include information relating to interest due dates; and

- The Company purported to provide documents relating to the sales, purchase, production and warehouse processes of the Company, but the documents do not include sales and procurement contracts, material logs, and other requested documentation.

- *June 2, 2011*: Mr. Fu informed the Audit Committee that the RMB 2.2 million agreed-upon retainer had been wired to Cadwalader's account, however Cadwalader received only RMB 400,000 from the Company.

  - Mr. Fu later explained that the amount was not the total RMB 2.2 million because of a transfer limitation set by the Company's bank, and that the remainder of the retainer would be paid by June 3.

  - Based on the wire transfer record provided by Mr. Fu, the wire transfer was initiated from Jiangbo's account at                                    via internet banking.

    - The Company had previously provided documents to E&Y indicating that approximately            of its cash was held at                   and that                   was not the Company's primary account.

    - As noted above, E&Y had previously asked Mr. Fu whether the Company uses internet banking, and Mr. Fu had responded that the Company did not use and did not have access to internet banking.

-20-

*Confidential*

- *June 3, 2011:* Cadwalader received the remainder of the RMB 2.2 million agreed-upon retainer (transferred from

- *June 3, 2011:* Mr. Marks, Cadwalader, and Loeb participated in a call to discuss the status of the internal investigation.

  - Loeb reiterated its position that, to Loeb's knowledge, the Audit Committee had not been authorized to disclose any findings to the SEC, and that the Board should consider whether to grant that authorization only at the end of the internal investigation.[6]

## *Reasons for Resignation*

The facts and circumstances described above reveal a situation in which it is not possible for us to fulfill our obligations as independent members of the Audit Committee, and have left us no choice but to tender our resignation. In particular, the following reasons have compelled this decision:

1. *Lack of Cooperation.* Over the past five weeks, the Company has revealed an overall and continuing lack of cooperation, evidenced most recently by the fact that the documents and information received from the Company to date still remain deficient in substantial respects. In light of this conduct, the Audit Committee, Cadwalader and E&Y have been unable to conduct a thorough, independent internal investigation. Despite numerous and lengthy meetings, phone calls, emails, and memoranda in which expert advisors explained the importance of the internal investigation and the Company's cooperation with it, and despite the warnings of the potential serious ramifications of the Company's lack of cooperation, the situation has not improved in any material way. We can conclude that the Company, and in particular Mr. Cao, does not have the intention to cooperate with the internal investigation.[7]

2. *Manner and Timing of Payments to the Audit Committee's Advisors.* Although the Company has made certain invoice payments and retainer payments to Cadwalader and E&Y, the manner and timing of those payments have raised serious concerns regarding the Company's willingness and ability to pay for necessary investigative costs, and concerns about the veracity of banking information previously provided to Cadwalader and E&Y. In particular, the Company has previously provided documents indicating that it has a large cash balance at '                    representing approximately ' % of the Company's cash balance as of December 31, 2010. Nevertheless, the Company has not paid Cadwalader and E&Y from its accounts at '           '      Rather, the Company has paid the Audit Committee's advisers from either a much smaller Company account at

---

[6] Mr. Licker indicated, however, that if such authorization was necessary immediately for the internal investigation to continue that he was willing to recommend that the Board grant such authorization.

[7] To the extent any public disclosures imply that the Company is cooperating with the internal investigation, such statements are inaccurate.

*Confidential*

or, more troubling, from a personal bank account apparently belonging to an individual employee of Jiangbo. The Company also had previously indicated that the Company does not use and does not have access to internet banking, but the Company transferred funds to the Audit Committee's advisers via internet banking. Finally, although the Company pledged to timely pay an agreed-upon retainer to Cadwalader, the Company paid that retainer in piece meal and only days after it had indicated it would be paid in full. The Company explained to Cadwalader that the delay and partial payments were due to limitations placed on the Company's transfer of funds by the Company's banks. This explanation for the timing and manner of payment is either a troubling indication that the Company does not have free access to its cash balances, or a misleading excuse meant to hide the fact that the Company is unwilling to timely and fully honor its obligations to the Audit Committee.

3.   *No Realistic Options for Corrective Action.*   The Audit Committee has carefully considered potential ways in which the Company might be able to remediate the current situation, but have concluded that any such steps would be ultimately insufficient to permit the internal investigation to continue. Because we believe the primary source of the lack of cooperation is the Chairman, we have considered asking Mr. Cao to step down during the pendency of the internal investigation. However, we are convinced such a measure would be futile. First, we cannot unilaterally remove the Chairman for the pendency of the investigation, and understand that the Board would not act to remove Mr. Cao. Second, it is unreasonable to believe that Mr. Cao would voluntarily step down as Chairman. Third, even if Mr. Cao were to relinquish the chairman's position during the pendency of the internal investigation, the Audit Committee would fully expect, based on our experience and knowledge of the Company, that Mr. Cao would continue to exercise *de facto* control over the Company and the Board. The recent and consistent history of the Company's lack of cooperation with respect to the internal investigation is therefore more than likely to continue, and has made it impossible for Cadwalader and E&Y to continue the internal investigation in a credible and appropriate manner. Under such circumstances, the independent members of the Audit Committee can no longer serve the interests of shareholders by remaining on the Board.

**Next Steps and Recommendations**

In light of our decision to resign, we believe that it is appropriate to inform our fellow Directors of the steps we believe the Company should take to best ensure an acceptable transition and to best ensure that the Company's practices are improved to the extent possible. We therefore recommend that the Board resolve immediately to do the following:

- Authorize the Audit Committee to deliver to the SEC, per the SEC's request, all materials collected by Cadwalader and E&Y to date as part of the internal investigation;

- Authorize the Audit Committee to report to the SEC the initial observations from the internal investigation, and to report the fact of and reasons for the cessation of the investigation and the resignation of the independent members of the Audit Committee;

-22-

*Confidential*

- Remove unilateral check approval authority from Mr. Cao, and instead establish check approval authority to Mr. Jin, the CEO, and select others in senior management consistent with recognized "four-eyes principles"; and

- Direct the Company to implement standard Sarbanes-Oxley 404 policies as previously suggested by KPMG.

We regret that the Company has created circumstances that force us to resign as directors and that preclude the Audit Committee from conducting a thorough, independent investigation, which we believe clearly would benefit shareholders. We hope that you will permit a reasonable and professional transition.

Sincerely,

Michael Marks
Chair, Audit Committee of Jiangbo Pharmaceuticals, Inc.

John Wang
Member, Audit Committee of Jiangbo Pharmaceuticals, Inc.

-23-

*Confidential*

EXHIBIT A
&
Exhibit B

Redacted due to privilege

**Exhibit 99.5**

Chairman Cao, Mr. Jin and members of the Jiangbo Board of Directors,

As with Michael, I am also coming on 3 years of service as an independent director. Therefore, I will also not stand for re-election at the upcoming AGM. Please make the appropriate plans with legal counsel to amend the proxy documents as appropriate.

Best,
John

**Exhibit 99.6**

Mr. Jin,

If the Company needs an enumeration of differences there are too many to list exhaustively. Suffice it to say, there are many areas where I have disagreement with the Company. Specifically, I believe the Company should comply with the requests by E&Y and CWT, including but not limited to the requests for Elsa's computer and a list of all the computers and emails used by employees for business purposes. Moreover, I believe (and the Audit Committee has asked for over a year now) the Company should implement standard 404 policies as suggested by KPMG. Furthermore, I believe (and we have also asked for over a year) the Chairman should delegate check approval control to the CFO or CEO. Finally, I also disagree with the common practice by the company (also related to control over check writing) of late payment of professional fees, expenses, even salaries and financial obligations to investors/debt holders. These practices are unprofessional and increases risk to the company, it's management and shareholders. Something as little as showing up for organized board calls and participating attentively is an important aspect of this professionalism.

I hope the company can bring its business policies and procedures more in line with international best practices. It is my sincere belief that these improvements would greatly benefit the Company, it's shareholders and it's management.

I hope that you can understand why I am not able to include that sentence in the 8K. If you think this email should be disclosed in the 8K then I will stand by that decision. I will leave that decision to the Company.

Best,
John

*Privileged and Confidential*

June 6, 2011

Board of Directors
Jiangbo Pharmaceuticals, Inc. (the "Company")
25 Haihe Road, Laiyang Economic Development Zone
Laiyang City, Yantai
Shandong, China 265200


Board of Directors of Jiangbo Pharmaceuticals:


This letter is to inform you that I am resigning as a member of the Board of Directors of Jiangbo Pharmaceuticals, Inc., effective immediately.

It has been my pleasure to serve on the board for the benefit of the Company's shareholders. However, for the reasons detailed in writing to you in a separate letter, I feel the Company has made it impossible for me to fulfill my duties and that I have no choice but to resign.

It is my sincere hope that the Company can quickly rectify the circumstances that have occasioned my resignation.


Sincerely,

John Wang

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com
Source: Jiangbo Pharmaceuticals, Inc., 8-K, June 07, 2011

# EXHIBIT B

# RIGRODSKY & LONG, P.A.

Attorneys at Law                                                                                     www.rigrodskylong.com

Seth D. Rigrodsky                                                                                    Marc A. Rigrodsky
Admitted in DE, NY                                                                                   Admitted in CT, DC

Brian D. Long                                                                                        Scott J. Farrell
Admitted in DE, PA                                                                                   Admitted in NJ, NY

Timothy J. MacFall                                                                                   Gina M. Serra
Admitted in NY                                                                                       Admitted in DE, NJ, PA

August 1, 2011

**VIA FEDERAL EXPRESS OVERNIGHT DELIVERY**

Board of Directors
Jiangbo Pharmaceuticals, Inc.
c/o Elsa Sung, Registered Agent
1643 Royal Grove Way
Weston, FL 33327

Board of Directors
Jiangbo Pharmaceuticals, Inc.
c/o Elsa Sung, Registered Agent
1133 South University Drive Suite 210
Plantation, FL 33324

Re:     *Fla. Stat. § 607.07401 Demand Letter*

Dear Sirs/Madam:

Our firm, along with the Law Offices of Bruce G. Murphy, represent Derek J. Bruce, who holds 1,900 common shares of Jiangbo Pharmaceuticals, Inc. ("Jiangbo" or the "Company"), and has been a holder since 2007.  On behalf of our client, this letter serves as a formal demand,  pursuant to Fla. Stat. § 607.07401, that Jiangbo's Board of Directors "("Board") immediately commence litigation on behalf of the Company against Cao Wubo ("Cao"), Feng Xiaowei ("Feng"), Huang Lei ("Huang"), Ge Jian ("Ge"), Michael Marks ("Marks"), John Wang ("Wang"), Jin Liuxian ("Jin"), Else Sung ("Sung"),  Ziling Sun ("Ziling"), and any other appropriate Jiangbo directors and officers for breaches of fiduciary duty, securities fraud, abuse of control, gross mismanagement, unjust enrichment, and waste of company assets, in connection with their activities as directors and officers of the Company.  In addition, this letter serves as a formal demand pursuant to Fla. Stat. § 607.07401 that the Board immediately commence litigation on behalf of the Company against Frazer Frost, LLP ("Frazer") and any appropriate partners and employees thereof for professional negligence, malpractice, and other appropriate causes of action in connection with its services as Jiangbo's principal accountant.

As described in the complaint in the matter styled *Lagace v. Jiangbo Pharmaceuticals, Inc., et al.*, C.A. No. 11-cv-22556-MGC (S.D. Fla.) (the "*Lagace*

---

919 North Market Street, Suite 980                                              585 Stewart Avenue, Suite 304
Wilmington, Delaware 19801                                                      Garden City, New York 11530
T  302.295.5310                                                                 T  516.683.3516

Board of Directors                                    RIGRODSKY & LONG, P.A.
Jiangbo Pharmaceuticals, Inc.
August 1, 2011
Page 2 of 8

Complaint"), Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling, among others,
engaged in conduct in violation of Section 10(b) of the Securities Exchange Act (the
"Act"), 15 U.S.C. § 78j, Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and
Section 20(a) of the Act, 15 U.S.C. § 78t.  Further wrongdoing is described in a letter
dated June 6, 2011, addressed to the Board from former Director and Audit Committee
Chairman Marks and former Director and Audit Committee member Wang, Ex. 99.4 to
Form 8-K filed with the United States Securities and Exchange Commission ("SEC") on
June 7, 2011 (the "AC Letter"), in which Messrs Marks and Wang announced their
resignation from the Board.

The AC Letter asserted, among other things, that:

- The Company's senior management stonewalled an investigation
  of financial irregularities by the Audit Committee commenced
  after the SEC served a subpoena on the Company in late March
  2011, by refusing to produce documents and pay the AC
  Committee's outside legal counsel and forensic accountant;

- Documents that were not produced as part of the AC Committee
  investigation went to the heart of the Company's financial
  statements, and involved matters such as the amount of Jiangbo's
  cash reserves; its failure to pay interest on its debentures timely;
  the existence and location of certain bank accounts and the veracity
  of its bank statements; the number of people employed by the
  Company; and details regarding its sales, purchases, production,
  warehouse processes, acquisition of land use rights, computer and
  IT information, systems, and vendors;

- The Company used secondary accounts and personal accounts to
  pay expenses;

- Company officials claimed Jiangbo did not use internet banking
  but wire transfer records showed otherwise;

- Records showed Company officials used personal email accounts
  to conduct official business;

- Bank records indicated Jiangbo transferred RMB 200 million to
  Shandong Hilead Biotechnology Co. ("Hilead"), a company
  founded, chaired, and majority-owned by Cao, even though the
  two firms had no formal relationship, for the purpose of infusing

Board of Directors                          RIGRODSKY&LONG, P.A.
Jiangbo Pharmaceuticals, Inc.
August 1, 2011
Page 3 of 8

> capital into Hilead; and Company records indicated that Hilead
> was in possession of six of Jiangbo's computers;

- Jiangbo would never cooperate with the AC because Cao, as
  Chairman of the Board, is "the primary source of the lack of
  cooperation," and asking him to step down would be "futile," "the
  Board would not act to remove Mr. Cao," and even if he was
  removed, he "would continue to exercise *de facto* control over the
  Company and the Board;

- Marks emailed the Board on May 27, 2011, that "I second John
  [Wang's] concerns about the lack of professionalism within the
  company over many years of delayed payments, lack of focus of
  senior management, [and] commitment of company resources to
  related parties;" the latter reference being to Jiangbo's relationship
  with Hilead.

The *Lagace* Complaint alleges "Jiangbo issued materially false and misleading
statements and omitted to state material facts that rendered their affirmative statements
misleading as they related to the Company's operations, financial condition, and certain
financial transactions" beginning on May 17, 2010, when the Company filed its Form 10-
Q for the quarterly period ended March 31, 2010 (fiscal third quarter). *Lagace* Complaint,
¶¶ 2, 34. The *Lagace* Complaint is based largely on the allegations in the AC Letter. In
addition, the *Lagace* Complaint noted that trading of Jiangbo's common shares was
halted by the SEC on May 31, 2011, and has yet to resume. *Id.*, ¶¶ 3, 43.

The *Lagace* Complaint listed the following disclosures in the AC Letter as containing
materially adverse information that was not provided to the Company's shareholders:

- The Company had misled investors about the number of
  individuals it employed. As indicated in the Company's SEC
  filings . . . Jiangbo had approximately 1,400 employees as of May
  20, 2010, "including 82 administrative staff, 412 production crew,
  440 full-time salespersons and 560 part-time salespersons."
  However, as disclosed by the [AC L]etter, the current employee
  list indicates that there are less than 500 individuals employed by
  the Company.

- The Company's unwillingness to release employee e-mail
  information, in addition to the fact that only a mere fourteen email
  addresses were released during the independent investigation,

Board of Directors                          RIGRODSKY&LONG, P.A.
Jiangbo Pharmaceuticals, Inc.
August 1, 2011
Page 4 of 8

further suggests that the Company materially misrepresented the size of its workforce by nearly a factor of three-to-one.

- [The AC Letter] clearly shows that the Company failed to disclose a 200 million RMB transaction of a related party nature, and that there was an undisclosed "commitment of company resources to related parties."

- The 200 million RMB transaction referenced by the [AC] Letter was to the benefit of Hilead . . . a private company in the same city as Jiangbo's main operating subsidiary.

- Defendant [Cao] is Chairman of the Board of Directors of Hilead, and was undoubtedly aware of the transfer due to his position within the two companies [due to] the fact that he had sole control over check issuance at Jiangbo.

- As a result, Jiangbo's transfer of 200 million RMB to Hilead is of an apparent related party nature. Moreover, the existence of the transfer, as well as its apparent related party nature went completely undisclosed by the Company.

- [B]oth the [AC] Letter and the Company's repeated failure to timely pay the interest and/or principle on the Debentures suggests that the Company either has drastically less cash than reported . . . or that it does not have access to said cash.

- [I]t is a significant and indisputable red flag that a Company with purported cash reserves of more than $100 million would continue to fail in its obligations with respect to the Debentures and thereby incur significant penalties at the expense of its shareholders.

- It is also a red flag that a Company with such purported cash reserves would pay professional fees [to the AC Committee's advisors] from, in one reported instance, an employee's personal checking account, and in the other instance, from a non-primary bank account that has (or should have) significantly less cash than the Company's primary account.

- If the Company does indeed have the cash reserves that it claims, the only other possible inference is that Jiangbo . . . does not have access to the assets of its main operating subsidiary, Laiyang

Board of Directors                                RIGRODSKY&LONG, P.A.
Jiangbo Pharmaceuticals, Inc.
August 1, 2011
Page 5 of 8

> Jiangbo (which, as indicated in the Company's most recent 10-K, has signed an equity pledge with one of Jiangbo's wholly-owned subsidiaries, thereby entitling Jiangbo to 100% of Laying Jiangbo's assets). This was undisclosed . . . and makes the Company's representation that it operates, controls, and beneficially owns Laiyang Jiangbo materially misleading.

> • Lastly, the Company has made material misstatements and omissions with respect to the quality of its internal controls. As indicated by the [AC] Letter, Defendant [Cao] is the only officer or director of Jiangbo that [sic] has "unilateral check approval authority." In effect, this means that Defendant [Cao] – who is not an officer of Jiangbo – has *de facto* dictatorial control over the Company as he is the only member of the [sic] management that [sic] can authorize payments to third parties. This is a significant and material undisclosed weakness in the Company's internal controls.

*Lagace* Complaint, ¶¶ 46-56 (emphasis in original).

Frazer was Jiangbo's principal accountant from January 7, 2010, through March 30, 2011. Frazer is a United States-based auditing and accounting firm that rapidly acquired a reputation for being associated with disreputable Chinese firms such as RINO International. Frazer issued the following report in Jiangbo's Form 10-K for the fiscal year ending June 30, 2010, which was filed with the SEC on September 28, 2010:

> We have audited the accompanying consolidated balance sheets of Jiangbo Pharmaceuticals, Inc. and Subsidiaries (the "Company") as of June, 2010 and 2009, and the related consolidated statements of income and other comprehensive income, shareholders' equity, and cash flows for each of the years in the three-year period ended June 30, 2010. Jiangbo Pharmaceuticals, Inc.'s management is responsible for these consolidated financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for

Board of Directors                                   RIGRODSKY & LONG, P.A.
Jiangbo Pharmaceuticals, Inc.
August 1, 2011
Page 6 of 8

designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Jiangbo Pharmaceuticals, Inc. and Subsidiaries as of June 30, 2009 and 2008, and the consolidated results of its operations and its cash flows for each of the years in the three-year period ended June 30, 2010 in conformity with accounting principles generally accepted in the United States of America.

It is now apparent that the consolidated statements in the Form 10-K did not "present fairly, in all material respects, the consolidated financial position of Jiangbo Pharmaceuticals, Inc. and Subsidiaries as of June 30, 2009 and 2008," and "the consolidated results of its operations and its cash flows for each of the years in the three-year period ended June 30, 2010" were not "in conformity with accounting principles generally accepted in the United States of America." Frazer's statement and its performance as the Company's principal accountant reflect at a minimum professional negligence. They are also potentially fraudulent.

Jiangbo has already expended millions of dollars in connection with the AC investigation. It will spend millions more defending the SEC investigation that prompted the AC investigation and the *Lagace* securities fraud action, as well as any other governmental or private investigations or litigation instituted against the Company. It is inevitable that Jiangbo will be required to restate its financial reports for *at least* the period covered by the *Lagace* action, *i.e.*, May 17, 2010, through May 31, 2011, and probably for a much longer time. The Company may be liable for hundreds of millions of dollars in damages if it loses or settles the *Lagace* action and any other litigation brought by governmental authorities or private persons or entities. In addition, the Company faces the prospect of permanent delisting by the NASDAQ. Furthermore, the Company's reputation has been severely damaged. The Company has also wasted a substantial amount of money in compensation and benefits paid to Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling. Its market capitalization has been severely diminished, and its ability to raise equity in the future has been all but destroyed. All of this substantial damage stems proximately from Cao's, Feng's, Huang's, Ge's, Marks's,

Board of Directors                                    RIGRODSKY&LONG, P.A.
Jiangbo Pharmaceuticals, Inc.
August 1, 2011
Page 7 of 8

Wang's, Jin's, Sung's, and Ziling's (and those of others employed by the Company)
breaches of fiduciary duty, securities fraud, abuse of control, gross mismanagement,
unjust enrichment, and waste of company assets in connection with their activities as
directors and officers of the Company, as well as from Frazer's professional negligence,
malpractice, and potentially fraudulent activity.

By reason of their positions as directors and/or officers and fiduciaries of Jiangbo,
and because of their ability to control the business and corporate affairs of Jiangbo, Cao,
Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling owed Jiangbo and its shareholders
fiduciary obligations of good faith, loyalty, and candor, and were and are required to use
their utmost ability to control and manage Jiangbo in a fair, just, honest, and equitable
manner.  Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling were and are
required to act in furtherance of the best interests of Jiangbo and its shareholders so as to
benefit all shareholders equally and not in furtherance of their personal interest or benefit.
Each director and officer of the Company owes to Jiangbo and its shareholders the
fiduciary duty to exercise good faith and diligence in the administration of the affairs of
the Company and in the use and preservation of its property and assets, and the highest
obligations of fair dealing.

Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling, because of their
positions of control and authority as directors and/or officers of Jiangbo, were able to and
did, directly and/or indirectly, consciously commit and/or exercise control over the
wrongful acts complained of herein.  Because of their executive, managerial, and director
positions with Jiangbo, each of them had knowledge of material non-public information
regarding the Company.  Once the members of Jiangbo's Board were placed on notice of
material information concerning the Company's affairs, they were required to make
immediate public disclosure of that information.  Additionally, once the Board is put on
notice of illegal conduct, the Board has a duty to act on that information.

For the reasons described above, Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung,
and Ziling all breached their fiduciary duties, committed securities fraud, abused their
control, engaged in gross mismanagement, were unjustly enriched, and wasted company
assets in connection with their activities as directors and officers of the Company, all of
which caused substantial harm to the Company and its shareholders.

Consequently, on behalf of our client, Derek J. Bruce, we hereby demand
pursuant to Fla. Stat. § 607.07401, that Jiangbo's Board of Directors immediately
commence litigation on behalf of the Company against:  (1) Cao, Feng, Huang, Ge,
Marks, Wang, Jin, Sung, and Ziling and any other appropriate Jiangbo directors and
officers for breaches of fiduciary duty, securities fraud, abuse of control, gross
mismanagement, unjust enrichment, and waste of company assets, in connection with
their activities as directors and officers of the Company; and (2) Frazer and any

Board of Directors                                   RIGRODSKY & LONG, P.A.
Jiangbo Pharmaceuticals, Inc.
August 1, 2011
Page 8 of 8

appropriate partners and employees thereof for professional negligence, malpractice, and other appropriate causes of action in connection with Frazer's services as Jiangbo's principal accountant.

Please be advised that the failure to take all of the actions demanded will result in the institution of litigation on behalf of the Company in accordance with the laws of the State of Florida.

Very truly yours,

Seth D. Rigrodsky

cc:     Bruce G. Murphy, Esq.
        The Law Offices of Bruce G. Murphy
        129 Meadows Lane
        Banner Elk, NC  28604

# EXHIBIT C



2200 Ross Avenue, Suite 2200
Dallas, TX 75201
Telephone: 214-740-8000
Fax: 214-740-8800
www.lockelord.com

Susie Hazard
Legal Secretary
Direct Telephone: 214-740-8148
Direct Fax: 214-756-8148
shazard@lockelord.com

Attorneys & Counselors

## Fax Cover Sheet

8/12/2011 10:14:44 AM CDT

| To | Organization | Fax Number | Phone Number |
|---|---|---|---|
| | | 13026547530 | |

If you do not receive all pages, please call 214-740-8148.

Subject:    Fax to Seth D. Rigrodsky

Message:

from Roger Cowie

Locke Lord Bissell & Liddell LLP

2200 Ross Avenue, Suite 2200

Dallas, Texas  75201-6776

This message is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the U.S. Postal Service.  Thank you.



**Locke Lord Bissell & Liddell** LLP

Attorneys & Counselors

2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
Telephone: 214-740-8000
Fax: 214-740-8800
www.lockelord.com

Roger B. Cowie
Direct Telephone: 214-740-8614
Direct Fax: 214-756-8614
rcowie@lockelord.com

August 12, 2011

**Via Telecopier to 302-654-7530**

Seth D. Rigrodsky
Rigrodsky & Long, P.A.

Re:   Jiangbo Pharmaceuticals, Inc. ("Jiangbo")

Dear Mr. Rigrodsky:

We have been recently retained by Jiangbo to, among other things, advise the company and its directors with respect to your letter dated August 1, 2011. Accordingly, until further notice, please direct all future communications with Jiangbo or its directors regarding this matter to me.

Sincerely,

Roger B. Cowie
For the Firm

RBC:sh

cc:   Jason Lewis
      Tom Tong